# THE CITY OF ST. LOUIS *vs.* THOMAS ALLEN.

1. The 17th section of the 7th article of the charter of St. Louis, approved February 15, 1841, was continued in force by the act of Feb. 8, 1843.
2. The act of 1841, enlarging the corporate limits of the city of St. Louis, is constitutional.

### ERROR TO ST. LOUIS CIRCUIT COURT.

#### STATEMENT OF THE CASE.

The defendant in error filed his bill of equity at the November term 1846, of the St. Louis circuit court, against the city of St Louis, plaintiff in error, to restrain the said city, its officers and agents from selling certain lands for taxes, assessed therein by said city, and praying for general relief, &c.

The bill sets forth the locality and description of the lands and property, and the rights and interests therein of the defendant in error, that said lands and property were wholly without the city limits, prior to the passage of the act of incorporation of said city, approved February 15, 1841. The 17th sec. art. 7, of said last named act, is as follows :

"Sec. 17. The common council shall within twelve months from the passage of this act, cause to be graded and Macadamised the carriage way of Broadway, south seventh, Washington avenue and Market streets, twenty-five feet wide from the boundaries of the city established by this act, to the nearest point macadamised within the present limits of the city, and until such carriage ways aforesaid are made and completed, the lots and grounds beyond the present limits of the city shall not be taxed for city purposes, more than one sixteenth of one per cent."

All which allegations are admitted by the answer of the city.

The bill further alleges that another act of incorporation of said city was granted, approved, February 8, 1843, which last named act extended the boundaries of the city so as to include the whole of the lands and property upon which the tax complained of was assessed ; that the last named act was passed by the General Assembly without the consent of complainant or his grantor : That the city levied a tax for city purposes on said lands and improvements for the years 1843 and 1844, of seven-eighths of one per cent. on the assessed value thereof ; also a tax on the same and for same purposes, for the years 1845 and 1846, of one per cent. on the assessed value thereof ; that the complainant, before said lands and property were advertised for sale, by the comptroller of the city, for non-payment of said taxes, caused a tender of the one sixteenth of one per cent. of the assessed value of said property for the years above mentioned, to be made to the collector of taxes for the city, which tender was refused by the city ; that subsequent to such tender, the comptroller of the city advertised the said lands for sale for the delinquent and unpaid taxes assessed for the years aforesaid ; all of which allegations are admitted by the answer of the city.

The bill further alleges that the city, prior to levying the said taxes of seven-eighths of one and of one per cent. aforesaid, had not performed the condition or requirements of sec. 17, art. 7, of the act of incorporation, approved Feb. 15, 1841, upon the performance of which condition depended the power of the city to levy a greater tax on said lands (if taxable at all by the city) than one sixteenth of one per cent. ; that a part of the taxes for the non payment of which the said lands were advertised for sale, were assessed on other property ; that the acts of incorporation of 1841 and 1843, extending the boundaries of the city, and including within such boundaries the said lands of complainant against his will, and without the prior or sub-

sequent assent thereto of himself or his grantor, all unconstitutional and void; that the 17th section of article 7, of the act of 1841, was continued in force by the *exception* contained in the 24th section of article 7, of the act of 1843, which last named section is as follows:

"Sec. 24. All acts and parts of acts contrary to or inconsistent with the provisions of this act, or within the purview thereof, except the 17th section, of the act entitled, an act to amend an act to incorporate the city of St. Louis, approved 8th Feb. 1839, are hereby repealed."

The answer of the city denies that the condition or requirements of sec. 17, art. 7, of the act of 1841, had not been fulfilled, and performed before the said taxes were assessed, and alleges that said condition was fully performed by the city. The answer denies that any part of the tax for the nonpayment of which the said lands were advertised to be sold by the comptroller, were assessed on other property than said lands; the answer denies that the acts of 1841 and 1843, extending the boundaries &c. of the city, are unconstitutional or void; the answer denies that the 17th sec. of art: 7 of the act of 1841 was continued in force by the exception contained in the 24th sec. art. 7 of the act of 1843, and asserts that the said exception is void for uncertainty; and that sec. 17, art. 7, was repealed by the last named act; the answer insists that the duty to grade and macadamize the streets mentioned in the 17th sec. art. 7, of the act of 1841, was not a condition precedent to the exercise of the right and power to levy a tax on the said lands of seven-eighths, and of one per cent. on the assessed value thereof, because said sec. 17 is inconsistent with other parts of said act, impossible to be fulfilled, unintelligible and void for uncertainty.

To the answer of the defendant, the complainant filed his replication.

At the April term of said court, the cause was heard on bill, answer, replication and proof.

On the part of the complainant, the following evidence was offered, viz: tax bills of the city, and to the effect that a tax of seven-eighths of one per cent. on the assessed value of the lands therein mentioned, was levied by the city for the year 1843, upon the following property, (the lands &c. being the same in the complainant's bill mentioned) viz:

| | | |
|---|---|---|
| 75¼ acres and improvements, valued at | | $57,300 |
| 1⅔ " " " " " | | 750 |
| 10 Slaves " " | | 3,000 |
| 3 Horses $90, & 3 cattle, &c. | | 205 |
| | | $61,255 |

| | | |
|---|---|---|
| Tax ⅞ per cent. | $535 93 | |
| 1 Dog tax, $1, 1 poll tax 50cts. | 1 50 | |
| Int. from 1st. July 1843, to 1st. July 1846, 3 yrs. | 96 66 | |
| Total, | $634 14 | |

Also a similar bill for a tax of seven-eighths of one per cent. on the assessed value of the same property, *mutatis mutand s*, for the year 1844; also a similar bill for a tax of *one per cent*. on the assessed value of the same property *mutatis mutandis*, for the year 1845; also a similar bill for a tax of *one per cent*. on the assessed value of the same property *mutatis mutandis*, for the year 1846.

The complainant also read in evidence from the *Republican newspaper*, printed in said city, the advertisement in which the lands in question were advertised for sale by the comptroller of said city, Robert Simpson, for the non-payment of the said taxes assessed on said lands as aforesaid by the city, for city purposes for the years 1843, 1844, 1845 and 1846, which sale, according to said advertisement, was to have taken place at the court house in said city on the 30th day of November, 1846.

The complainant also proved that at the head of Washington avenue, about 300 feet east of the western limits of the city, (as it was then incorporated) there is a cross street 30 or 40 feet wide, which is paved from the head of Washington avenue to Christy street, which last

51

named street is paved out westward to the city limits ; that said cross street was opened about 15 years ago, but not paved until 4 or 5 years ago, under the charter of 1841. That Washington avenue was opened east of said cross street, under the charter of 1841.

The complainant also proved that Lafayette street, in *Soulard's addition*, was laid out by the proprietors before the extension of the city limits ; that the distance from there to the south boundary of the city is a half or three quarters of a mile ; that in 1841 there was no paving on 7th street south of Market street ; at that time 7th street extended south to Hickory street, and thence it coincided with Market street in Soulard's addition, and run on south to Lafayette street. The complainant also produced in evidence a map of the city published by *Hutawa*, which by agreement may be used and referred to in this court.

On the part of the defendant, a letter from the city engineer to Wm Russell (under whom complainant derives title) in regard to paving 7th street and opening same, vide record, page 48 and following, dated May 31st, 1842, and Russell's reply thereto, dated June 3rd, 1842, with his deed relinquishing the right of way to the city and the public over a part of south 7th street, were read in evidence.

The defendant produced and read in evidence various ordinances and parts of ordinances of the city, "printed and published in book form, and purporting to be so printed and published by authority of the corporation," (and which by agreement are to be read in this court,) as follows : An ordinance entitled "a condensed ordinance in relation to streets and other highways," approved November 24, 1835. This ordinance establishes and directs the opening of all the streets named in complainant's bill as the city was then incorporated, and extending said streets to the out limits of the city. Ordinance No. 845, entitled an ordinance to establish, open, grade and macadamize certain streets therein named, approved October 9th, 1841.

This ordinance extends Broadway one hundred feet in width to the northern limits of the city according to its boundaries at that time. Also Market street eighty feet wide to the western limits ; also Washington avenue eighty feet to western limits ; and also south seventh street 60 feet wide to southern limits. And the fifth section of this ordinance directs the city engineer (who is a *public* officer, and recognized as such by the city charter of 1841,) to cause the said streets "to be surveyed, levelled, located and opened to their full width," &c. ; also by the same ordinance, the city engineer is directed to grade and macadamize the said streets, "according to the city charter." Several other ordinances, supplemental and amendatory, adopted during the years 1841 and 1842, and which made further provision for the grading and macadamizing of said streets, and directing and making the duty of city officers to carry same into effect, were also read in evidence.

The defendant also read in evidence ordinance No. 1174, entitled "an ordinance providing for assessment and collection of the revenue and taxes of the city and for other purposes," approved September 5th, 1842.

This ordinance provides for the appointment of assessors, and makes it their duty to commence assessing property in their respective districts on the first day of March, 1843, and on the same day for each year thereafter, and make return of their assessment on or before the first day of July in each year. Vide sec. 9. The same ordinance provides for the levying of a dog and poll tax.

Sect. 3, art. II of same ordinance, prescribes the powers and duties of the collectors of the revenue and taxes of the city, and directs that whenever any tax shall remain unpaid, and sufficient goods and chattels and effects cannot be found to satisfy the same, the real estate and property on which such tax is assessed, be sold, &c., after giving public notice, &c.

The defendant also gave in evidence ordinance No. 1184, entitled "an ordinance declaring the per centum to be collected on the tax list of the city for the year 1843, approved June 30, 1843, which levied a tax of 7-8ths of one per cent. on the taxable property within the city limits. Also ordinance No. 1342, approved June 19, 1844, levying a tax of 7-8ths of one per cent. on the taxable property within the city for 1844.

Also ordinance No. 1490, entitled "an ordinance establishing the per centum to be collec-

ted on real and personal property, approved June 24, 1845, which levied a tax of one per centum on the taxable property for the year 1845.

Also ordinance No. 1650, approved June 17th, 1846, which in like manner levied a tax of one per cent. on the taxable property for the year 1846.

No other proofs were heard in the case, and the court below decreed for the complainant, and made the injunction perpetual, restraining the defendant from selling the lands in the complainant's bill mentioned for said taxes, and from collecting said taxes in any other way, &c., &c.

The case comes into this court by writ of error, and the following errors are assigned:

1st. That the circuit court erred in finding for complainant.

2nd. That said court erred in making the injunction perpetual.

3rd. That the court erred in rendering said decree for plaintiff.

## Todd & Krum for plaintiff in error.

1. The several acts of the general assembly of Missouri, incorporating and extending the city of St. Louis mentioned in complainant's bill, are constitutional and valid laws, and that it was competent and lawful for the city to exercise all the powers and jurisdiction which it did exercise in this case, over the lands of the complainant within the corporate limits of the city.  9 Mo. Rep. 507; 9 Cranch. 52; 4 Wheat. 518; 2 Kent. 206; 1 Tucker's Com. 162.

2. The act of February 8th, 1843, repealed all prior acts of incorporation, and the exception in the last named act is void for uncertainty.  "D. Warris on statutes," pages, 694, 699; 7 vol. law lib., as to rules of construction.

3. Even admitting that sec. 17, art 7 of the act of 1841, was not repealed by the act of 1843, yet the complainant failed to show that the condition specified in sec. 17, art. 7, of the act of 1841, had not been performed by the city before the tax or taxes complained of were assessed, and the burthen of proving that said condition had not been performed, rests upon the complainant.  2 Daniels Chan. 939, note (1;) ib. 991, and note 1; 1 Greenleaf Ev. sec. 74, 78; Grisly's Eq. Ev. 238, 289.

4. The city of St. Louis being a municipal corporation, its officers are public officers, so declared by its charter, and whatever duty is by law imposed on such officers, it will be presumed that they performed such duty until the contrary is made to appear.  1 Phil. Ev. 195, C. & H. note 296; 14 J. R. 182.

5. Whether or not the act of 1843, repealed the 17th sec. art. 7, of the act of 1841, yet the allegations and proofs on the part of the city, show, that all the requirements of the last named act, had been performed, before the tax or taxes complained of were assessed.  The defendant's answer being responded to, the bill must be taken as true, unless disproved by two witnesses, or one witness and circumstances.  1 Greenleaf sec. 260; 1 Page Rep. 209.

6. The taxes for the years 1843, 1844, 1845 and 1846, were lawfully assessed upon the real estate and property in question.  Vide city charters and ordinances, before referred to.

7. Whether said taxes were lawfully assessed or not, the complainants allegation and proofs, do not make a case to entitle him to the relief sought, nor to any relief in a court of equity.  The case made does not show that the sale would have thrown a cloud upon complainant's title, and besides he had a full and adequate remedy at law.  1 Hal. 352; 12 Mo. 132; 9 Page 388; 10 ib. 539; 17 Mass. 461; 12 Pick 206; 10 Conn. 127; 6 ib. 223.

8. In any view of the case the decree of the circuit court is erroneous, because the city is restrained from collecting the whole tax or any part thereof for the years 1843, 1844, 1845 and 1846; whereas the complainant concedes (and such is undoubtedly the law) that the city was authorized to collect a tax upon the property in question of one-sixteenth of one per cent upon the assessed value thereof.

GEYER for defendant.

I The seventeenth section of the seventh article of the act of 15th Feb. 1841, entitled "an act to amend an act to incorporate the city of St. Louis, approved 8th Feb. 1839," was not repealed by the act of the 8th February 1843, entitled an act to reduce the law incorporating the city of St. Louis and the several acts amendatory thereof into one act and to amend the same. That section is not contrary to, or inconsistent with any of the provisions of the last mentioned act and was evidently intended to be excepted from the repealing clause.

The law does not favor repeals by implication, nor is such repeal inferred unless the repugnancy is quite plain and unavoidable. 6 Bac. A. tit. Statute D; Planters' Bank vs. State, 2d Smedes & M. 628; Sheel. vs. Commonwealth, 6 Watts & S.

A statute repealing all former acts within its purview does not repeal the provisions of former laws, as to cases not provided for by the repealing statute. Payne vs. Conner, 3 Bibb, 180.

Where two statutes can stand together the latter will not be construed to repeal the former. Ludlow vs. Johnson, 3 Ham. 553; Morris vs. Del. & Schuylkill Canal, 4 Watts & S. 461; Loker vs. Brookline, 13 Pick. 342, 348; Kenney vs Malloy, 3d Ala. 626; Bower vs. Lease, 5 Hill 221; Commonwealth Bank vs. Chambers, 8 Smedes & M. 9; Bruce vs. Schuyler, 4 Gel. 221; Daviess vs. Fairbairn, 3d How'd. U. S. 636; Beals vs. Hale, 4 How'd. U. S. 57. It is not sufficient to establish that subsequent laws cover some or even all the cases provided for by the former law, there must be a positive repugnancy between the provisions of the new laws and the old. Wood vs. United States, 16 Peters 362. Where the provisions of a precedent statute are not incompatible with those of a subsequent one in pari materia, it is not repealed by construction. Brown vs. Miller, 4 J. J. Marshall, 474.

The act of Feb. 1841, contains three sections numbered 17, one in article second, which was re-enacted in terms, as section 17, art. 2d in the act of 1843. The other two being in articles 4 and 7, are not re-enacted but neither of them is contrary to or inconsistent with any of the provisions of the act of 1843, and are therefore not repealed by the repealing clause of the latter act.

The seventeenth section of the 7th article of the act of 1841, is in the nature of a contract or condition not provided for by the act of 1843 and therefore not within its purview. If the acceptance of the act of 1841 is assumed, that acceptance must be understood to comprehend the terms and conditions, contained in that act beneficial to the inhabitants, namely that the real estate, without the old limits should not be taxed beyond the rate prescribed, until the condition should be performed. The repeal of that section would impair the contract and therefore it should not be supposed to have been the intention of the legislature to repeal it. Den. vs. Robinson, 2d Southard 680; McMecham vs. Major &c. 2 Har. & J. 41; Atwater vs. Woodbridge, 6 Conn. 223; Osborne vs. Humphrey, 7 do 335; Landon vs. Letchfield, 11 do. 251; Hardy vs. Wather, 7 Pick. 110; New Jersey vs. Wilson, 7 Crand. 164.

II. The power of the city of St. Louis to levy taxes on real estate, beyond the limits of the city as it stood incorporated prior to 1841, depended upon a condition precedent, prescribed by the seventeenth section of the act of February 1841. That condition has not been performed, and consequently the attempt to levy taxes on that description of property, exceeding one-sixteenth of one per cent. is unlawful.

III. The acts of 1841 and 1843 are of no validity whatever, so far at least as they purport to affect persons and property and not within the limits of the city as it stood incorporated before 1841, because they assume to subject such property and persons to the control of a corporation against the will of the inhabitants, and without any acceptance of the act of incorporation on their part.

In England though the King has power to create a corporation he cannot impose the constitution upon his subjects without their consent. It is as necessary to show the acceptance of the charter by those to whom it is offered as that it was granted by the crown. Willock on

corporations 30; Rex. vs. Passmore, 3 T. R. 240; Rex. vs. Amory, 1 T. R. 586; Rex. vs. Askew, 4 Bur. 2199.

The doctrine that the state legislature may pass any law not expressly prohibited, though sometimes asserted, cannot be maintained upon principle. There is nothing in the letter of the constitution to prevent the passage of laws to transfer property from one person to another or to impair vested rights except in cases of contract, yet such laws are not regarded as within the scope of legislative power—because against common right. Williams vs. Register, Cooke 214; Hoke vs. Henderson, 4th Dev. 1; Owens vs. Rain, 5 Hay. 106; Bowman vs. Middleton, 1 Bay 252; S. P. Harper, 200; Story 2, in Wilkemn vs. Leland, 2 Peters, 658; Jackson vs. Frost, 5 Cow. 346; Wally vs. Kennedy, 2 Yerg. 554; Jackson vs. Lyan, 9 Cow. 664; Stackpole vs. Heeby, 16 Mass. 36; Proprietors of Kennebec purchase vs. Larabee, 2 Greenl. 275; Hampshire vs. Franklin, 16 Mass. 76; Windham vs. Portland, 4 Mass. 390; Taylor vs. Porter & Ford, 4th Hill 140; Ham vs. Claws, 1 Bay 98.

IV. The power to levy taxes and regulate the disposition of real estate without the consent of the owners is a high prerogative, which if it may be delegated by the legislature to a corporation, must be delegated as an independent and express power, it cannot be raised by implication and cannot be exercised where the power is doubtful. Ellis vs. Marshall, 2 Mass. R. 269; Beatty vs. Knowler, 4 Peters 152; Gosler vs. Corporation Georgetown, 6 Wheat. 597; Collier vs. Doby, 6 Ham. 395; Berger vs. Clarkson, 1 Halstead 352.

NAPTON, J., delivered the opinion of the court.

The first question I shall examine in this case, is whether the 17th section of the 7th article of the charter of St. Louis, approved Feb. 15, 1841, was continued in force by the act Feb. 8, 1843.

The 24th section of the last article of the last named act contained this provision. "All acts and parts of acts, contrary to and inconsistent with the provisions of this act, or within the purview thereof, except the seventeenth section of the act entitled 'an act to amend an act to incorporate the city of St. Louis, approved 8th, Feb. 1839,' are hereby repealed."

The act of 1841, which is here referred to by its title, contains seven articles and *three sections numbered* seventeen. That the legislature intended to re-enact or continue in force one of these three sections is unquestionable, and if we can, with reasonable certainty, ascertain which of the three was intended, there can be no doubt of the duty of the court to carry out the intention of the legislature. If, however, it is impossible to ascertain, with reasonable certainty, which of these sections was designed, the exception must fall, and the continuance in force of the 17th section of the 7th article of the charter of 1841, must then depend upon the question, whether it is inconsistent with, or contradictory to, or within the purview of the act of 1843.

The first section numbered 17 in the act of 1841 occurs in the 2d article, and is re-enacted word for word in the corresponding section of the corresponding article of the act of 1843. That section is clearly

out of the question. The second numbered 17 is to be found in the 4th article of the act of 1841, and is as follows: "Whenever there shall be a tie in the election of city officers, the judges of election shall certify the same to the mayor, who shall issue his proclamation &c." This section is omitted in the corresponding article of the act of 1843 and the subject of a tie in the election of these city officers is not provided for. The only other 17th section in the act of 1841 occurs in the 7th article, and it is the one which forms the basis of the complainants bill. It is as follows: "The common council shall within twelve months from the passage of this act, cause to be graded and macadamized, the carriage way of Broadway, south seventh, Washington avenue, and Market streets, twenty five feet wide, from the boundaries of the city established by this act, to the nearest point macadamized within the present limits of the city, and *until such carriage ways aforesaid are made and completed, the lots and grounds beyond the present limits of the city shall not be taxed for city purposes, more than one sixteenth of one per cent.*"

We are satisfied that the last named section in the 17th section referred to in the act of 1843, and this opinion is not derived from mere conjecture, but as it seems to us, is attended with as much certainty as is requisite to authorize the courts to carry out the intentions of the legislature in the construction of their acts.

In the first place, it is to be observed, that the section of the act of 1843 which makes the provision or reservation which is the subject of enquiry, is found in the last article of the act, under the head of miscellaneous provisions, and the 17th section of the act of 1841, which provides for the grading and paving of certain streets as a condition precedent to the exercise of the taxing powers of the city beyond a certain limit over the citizens of the district annexed by that charter, is found in the corresponding article of the act of 1841, having the same caption. The 17th section of article 4, in the act of 1841 related to a subject which had been legislated on in the corresponding article of the act of 1843. It would have been a strange and singular circumstance, for the legislature in 1843, to have passed by the subject of a tie in an election, when legislating on the subject in the 4th article, and then at the conclusion of the law, and under the head of miscellaneous provisions, to insert a section, the object of which was to regulate a matter about which they had devoted a previous chapter or article of the law. Such a circuitous mode of legislating could never have occurred to any one, and if the 17th section of the 4th article of the act of 1841 had been accidentally omitted, and its retention or re-enactment was con-

sidered important, it was most natural and easy to have caused its insertion in the 4th article of the act of 1843. This is a trivial circumstance, it is admitted, but it is one among others which point conclusively to the real intent of the legislature.

But again, the seventeenth section of the 4th article of the act of 1841 is an unimportant one ; it is a provision for a contingency, which rarely happens and which is therefore very frequently left unprovided for in laws which relate to popular elections, and if the contingency should happen, no inconvenience or but little is likely to result from the want of a special provision. General principles of law will point out the course which must be taken in such contingences.

There is however a third reason which must still more forcibly influence the judgment, in the conclusion, that the seventeenth section of the 7th article, and not the 17th section of the 4th article, was intended. The former is obviously in the nature of a stipulation or contract, in which the new corporators are deeply interested. The duties imposed by that section upon the corporation are manifestly the consideration which induces these citizens to consent to have their property taxed beyond their previous liabilities. At all events, it is the consideration which induces the legislature to authorize the enlargement of the corporate limits and embrace these citizens within those limits, whether with or without their consent. No court would presume the repeal of such a law. It cannot be repealed by mere implication. Statute, affecting the rights of private individuals must be construed strictly. A blunder of a clerk is not to deprive citizens of their rights solemnly guaranteed by express legislative enactments. Courts of justice have long since ceased to be hampered by such clerical blunders, where they can distinctly and with sufficient moral certainty perceive the real intent of the legislature.

We think there is this moral certainty here. When we see the great importance and solemn character of the 17th section of the 7th article in the act of 1841 affecting as it does individual rights and corporate responsibility, when we further compare it, with the trivial and entirely unimportant character of the other section numbered seventeen in the same act, and when we also consider the positions which these sections occupy, it is not a mere matter of conjecture as to which of the two was intended.

The grounds of the present complaint are, that the city has not complied with the obligations imposed upon it by this seventeenth section of the charter of 1841, but has nevertheless proceeded to levy and collect

taxes upon the complainant and others who were brought into the corporation by this charter, greatly exceeding the limit fixed by this section. The city, in its answer, admits the levy of the taxes, but denies their failure to comply with the 17th section and asserts that the provision has been substantially complied with, and refers to the ordinances supposed to carry out the obligations imposed by this provision of the charter. There is no proof on either side, but, for the purpose of this case, it will be sufficient to take the facts, as stated in the answer, to be true.

Ordinance No. 845, is claimed to be a substantial compliance with section 17, art. 7 of the act of 1841. That ordinance is as follows : s. 4 declares, "south seventh street extended southwardly shall be 30 feet in width on each side of a centre line, commencing at the intersection of seventh and Market streets, and thence southwardly running in a direct line to the intersection of the centre of Soulard and seventh as now established, thence in a direct line to the intersection of the centre lines of Park avenue, as laid out by an act of the legislature, and south Market street of Soulard's second addition to the city, and thence parrallel to Carondelet avenue, and with the centre line of said south Market street, as laid out in said addition, to Lafayette street in said addition, and thence eastwardly on said Lafayette street to Carondelet avenue, and south on Carondelet avenue, and with the same to the southern boundary of the city, and west of the arsenal wall—which said *south Market street* and *Lafayette street* as aforesaid, and *Carondelet avenue* from the intersection of Lafayette street, therewith, to the southern limits of the city, and west of the arsenal wall—*shall be known* by the name and style of *south seventh street*. *Provided, however*, that all persons owning land or lots on either side of said south seventh street from the centre of Soulard and seventh streets as now established, southwardly to the south limits of the city, shall relinquish to the city of St. Louis all right and title to so much of said lands or lots, as shall be required for opening and extending said south seventh street to the southern limits of the city, &c."

Other provisions are made in this ordinance for having this south seventh street thus laid out as above, and the other streets named in the 17th section of the charter of 1841, graded and paved under the directions of the city engineer, and upon the conditions specified in the above section 4; and the answer asserts that this ordinance has been in fact, carried into effect, and the streets therein designated, have been graded and paved.

The seventeenth section of the 7th article of the charter of 1841, ex-

pressly provided that the lands and lots beyond the limits of the city as they were defined previously to that charter, should not be taxed over the one-sixteenth of one per cent., *until* four carriage ways or streets were graded and paved from the exterior limits as fixed by that charter to the nearest points within the old limits already graded and paved. The general course of these streets was indicated by calling them by the names of certain streets, already existing within the former limits of the city. They were four principal or leading thoroughfares, leading from different directions; two of them, Market street and Washington avenue coming in from the west at lines nearly parallel to each other; and the other two leading, one from the north, and the other from the south.

We do not perceive any justice or propriety in giving this seventeenth section a strict literal interpretation. Such an interpretation, it is obvious from a glance at the map of the city, would thwart the intent of the legislature and be productive of real injury to the parties who were intended to be benefitted. A fair and bona fide compliance is all that is requisite. The motive which prompted the introduction of this provision into the charter, is quite apparent. The owners of tracts of land, at that time used as farms, or at all events, not laid off into city lots, were to be brought within the limits of the corporation and subjected to its [taxing powers. Some equivalent for this important addition to the revenue of the city was thought proper and just. The equivalent determined on, was the construction of these four roads or rather paved streets, running in different directions through the lands thus about to be subjected to taxation. The construction of these streets would embrace the value of the lands over which they were built.

The city was then bound to comply fairly, and in good faith with this provision, before undertaking to increase the tax over one sixteenth of one per cent. But these streets, designated as south seventh, Broadway, Washington avenue and Market street, had no existence even on paper at the time this charter was passed, beyond the former limits of the city. How then are we to fix upon the exact course? Who is to determine this matter? An examination of the map or plat of the city, shows that the continuance of south seventh street in a direct line from the former limits of the city would carry that street to the river, and it would never reach the southern limits of the city, under the charter of 1843. This was a matter, as we think, within the sound discretion of the corporate authorities. The exact course of the streets was not provided for in the 17th section, and it was for the city authorities, to carry out by their general powers the spirit and intent of the section, as nearly as practi-

52

cable. Nor do we think it important that the continuation of these old streets through the new territory, should be known or called by the same names with the former streets. This was a matter of fancy not affecting the rights of any one. It matters not, that the common council have thought proper to abolish the names of south Market street and Lafayette street and Carondelet avenue, and designate them all as south seventh street; if these streets constituted a natural, convenient and proper continuation of the seventh street, which was confined to the old limits. We can see no propriety in interfering with these matters. The newly added citizens, for whose benefit the 17th section was enacted, are entitled to a continuous paved street, of a specified width, from the southern limits of the city to the point where seventh street is paved within the old limits; a street having the general course of seventh street as before known; but not necessarily a straight line or without angles in it. It should, undoubtedly, conform to the general plans of the city. But it was known at the time of the passage of this act, that various additions had already been made on the southern end of the city, and the new street must, therefore, conform as near as practicable to the squares and streets laid off in these additions.

Again, the ordinance No. 845, contained a proviso, that the owners of lots and lands adjoining seventh street should relinquish to the city so much ground as was requisite for constructing said street. This relinquishment of course the owners were not bound to make. Undoubtedly it is in the power of the corporate authorities, generally to cause streets to be opened on the best terms they can make, and to decline the improvement, if the lot holders will not accede to the proposed terms. Such a course may be generally a prudent and safe course for the interest of the city. But when they assume an obligation, as they did by the charter of 1841, to open and macadamize certain specified streets and their rights of taxation depend upon the fulfilment of this obligation, they cannot impose upon the owners of the lands adjacent to such contemplated streets the additional duty of relinquishing a portion of their land without compensation, and upon the refusal of such proprietors to part with their land without compensation, relieve themselves from the obligation they have assumed. The streets must be opened and paved before they can exercise the power of taxation. This is their contract and it must be performed. The law has invested them with ample powers to proceed with the opening and paving of the streets, whether the proprietors of the grounds adjacent think proper to give them the land or not. The sixth article declares that whenever it may be necessary to

take private property for opening, widening or altering public streets, the corporation shall make a just compensation to the person whose property is taken, and if the amount of such compensation cannot be agreed on, the mayor shall cause the same to be ascertained by a jury. The corporation of St. Louis had ample power then to cause all the streets specified in the 17th section of the 7th article of the charter of 1841 to be constructed, and it was the duty of the corporation to have these streets made as directed by that section, without reference to the consent or refusal of the proprietors to give up portions of their land without compensation. However, the proviso of this ordinance, 845, is not important in this case, if in fact the streets were laid off and macadamized as directed by the charter.

There can be no serious objections to the general course of south seventh street as laid out by ordinance 845, from the point where it leaves the city limits until it reaches Lafayette steet. It is true, that at its intersection with Park avenue, it diverges a little more southwardly than its previous course does, and becomes identified with a street in Soulard's second addition previously known as south market—but this was rendered necessary, or at least proper by the plan of Soulard's addition. Upon reaching Lafayette street, it is turned at right angles to its former course, and identified with this cross street, until it reaches Carondelet avenue, thus falling back one square east of its previous course. This appears somewhat singular, and is thus explained in the answer. "The section of the charter relating to streets, in its strictest signification, was carried out as to all the streets but south seventh street." That street was carried as far as it could be in the new limits, by continuing southwardly its general direction, as such direction existed in the old limits; but when the northern line of what is called the "little prairie field lots," was nearly reached, the city then not being able to agree with the proprietors of said field lots so as to continue the same direction through the same, deflected south seventh street eastwardly one block to what was called Carondelet avenue, and graded and paved Carondelet avenue to the southern limits, calling the whole street seventh street, &c." If we are to take the avenue as indicating the true and sole reason for this singular "deflexion" of seventh street, from the south to an east course, until it fell into the public highway of Carondelet avenue, we must regard it as very insufficient apology. That the city authorities and the proprietors of the little prairie field lots were not able to agree, may have arisen from the fact, that the agents of the city insisted upon running the street through their lots without giving them any compensa-

tion, as the ordinance 845 seems to have contemplated. If this were so, it was no reason for discontinuing the general direction of the street. As we have shown before, the city had the power to cause the street to be run through the land of private citizens and a mode was provided for agreeing upon the compensation. It may be that the further extension of this street in its previous course would have passed through the land of the complainant and thereby greatly enhanced its value. It was his right to insist upon a *bona fide* extension, provided no inseparable obstacles presented themselves. There certainly might be such as would well have justified the city even in giving this street this zigzag form, but as none such have been alleged, we will not presume them.

The power of the city of St. Louis to sell lands and lots for non-payment of taxes, was considered and decided affirmatively in the case of Russell vs. St. Louis. We admit, that the power to levy and *collect* taxes, when given to a corporation, does not necessarily imply a power to sell lands for the non-payment of the taxes thereon. There are other modes of collecting a tax than by an immediate sale of the land. Suit may be brought; judgment obtained and execution issued as for other debts. But it must also be admitted that the ordinary method of collecting taxes on land and the only one resorted to by the State herself, is by a direct sale of the property taxed. The words "levy and collect" therefore, though not of necessity implying a power of sale, and consequently, not to be conceded to a municipal corporation by mere implication, are yet capable of receiving such a construction, and when the legislature in the same charter insert other provisons distinctly and unequivocally assuming the existence of such a power, we regard such subsequent assumption or admission as a legislative interpretation of the previous language.

The constitutional power of the legislature to pass the act of 1841, and of 1843, extending the limits of the former corporation of St. Louis so as to embrace a portion of our citizens within the corporate limits without their consent, was determined affirmatively in the case of Russell vs. the city, heretofore referred to. The question has again been discussed at great length and with great ability. I shall not undertake an examination of all the positions assumed, on behalf of the complainant, much less a refutation of them. In most of the general propositions advanced I fully concur, but I cannot accede to the conclusions which have been drawn from them.

The whole argument of the learned counsel for the complainant may be resolved into a single proposition, and that proposition is a denial of the power of the legislature to create a municipal corporation, except

by the consent of the persons or a majority of them, included within such corporation. If the right to create the corporation in the first instance, without reference to the wishes of the citizens therein embraced be admitted, the right to enlarge its limits subsequently, so as to bring within its jurisdiction other citizens, without their consent, must follow as a necessary consequence. There is no conceivable abuse to which the latter power is liable that may not with equal propriety be predicated of the former. It is impossible to distinguish them and they must both stand or fall together.

This propostion may be still further narrowed. It must resolve itself into a strict prohibition or denial of power, on the part of our legislature, to create a municipal corporation, without the consent of every man within its limits. It will not do to admit that a majority may consent, and that such consent will give the power. Such an admission concedes the unqualified power. If a citizen of this State cannot be forced into such a corporation without his consent—if this right of his is protected by the constitution or those great fundamental principles which are incidental to every free government, whether expressly guarranteed by written constitutions or not, then the consent of every other man in the State cannot and ought not to deprive him of this right. Constitutions are made to protect the rights of minorities and of individuals. Majorities can protect themselves; the consent or acquiescence of a majority cannot confer a power, expressly or impliedly withheld by the constitution. It would be a poor protection to individual rights if our constitution left them at the mercy of a majority.

If it be conceded then, that a majority of the people living in the proposed addition to the city of St. Louis in 1841, could by their assent sanction the charter which the legislature in that year passed, the corporation as I think yields the power absolutely without qualification. If the proposition however, be established, that the legislature have not the power or the right to create a corporation of this kind, without the consent of the corporators, that consent must proceed from every individual to be affected, and the assent of a bare majority will not confer the power. And this is doubtless a correct proposition when applied to private corporations, or any kind of corporations not established for the mere municipal organization of the people of the State. It is no doubt usual in every case of this kind for legislative action to await the wishes of a majority of those who are to be affected by it. The legislature have no inducement to impose corporate governments upon her citizens, or any portion of them, when the citizens concerned do

not desire it. This, however, is obviously a matter of expediency; a circumstance which has and ought to have great weight in determining the passage of such laws, but not a circumstance which touches the question of power.

The plaintiff is then bound to maintain that the right of the legislature to create these city or town corporations is dependant upon the will of every citizen who is proposed to be embraced within their limits. I am unable to perceive any material distinction between legislation of this character and that which has been and continues to be exercised in the organization of counties. I see no inconvenience, no hardship or abuse which can occur in one class of legislation, which is not equally liable to happen in the other. The general purposes of the legislature are the same. In the organization of counties, it is true, that the tribunals entrusted with their local administration, do not have any police powers, and there is more uniformity in the extent of the power of taxation which is given to them by the legislature. But this results from a uniformity of interest and situation, which does not exist in reference to the various towns and cities scattered throughout the State. The latter vary so much in population, in wealth, commercial importance and in many other respects, that a uniform system of government would not be practicable or desirable. It is not to be denied, that in either class of legislation, to which we have alluded, great abuses will sometimes occur—but the correction of these abuses is as readily attained at the ballot box, as it would be by subjecting it to judicial revision. A citizen, or a number of citizens, may be substracted from a county, free from debt, having no taxation for county purposes, and added to an adjacent one, whose debts are heavy, and whose taxing powers are exercised to the utmost extent allowed by law, and this too without consulting their wishes. It is done every day. Perhaps a majority of the people thus annexed to an adjacent or thrown into a new county by the division of an old one, may have petitioned the legislature for this change— but this is no relief to the out-voted minority or the individual who deems himself oppressed and vexed by the change. Must we then to prevent such occasional hardships deny the power entirely?

It must be borne in mind that these corporations, whether established over cities, towns or counties or townships (where such incorporated subdivisions exist) are never entrusted, and can never be entrusted, with any legislative power inconsistent or conflicting with the general laws of the land, or derogatory to those rights, either of persons or property, which the constitution and the general laws guarantee. They

are strictly subordinate to the general laws, and merely created to carry out the purposes of those laws, with more certainty and efficiency. They may be, and sometimes are entrusted with powers which properly appertain to private corporations, and in such matters, their character as mere municipal corporations ceases. The corporation of St. Louis might be entrusted with powers to borrow money and with the funds thus procured, enter upon some great scheme of improvement supposed to be beneficial to the city and the State. It must then, to this extent and for this purpose, be like any other incoporated company established for making roads, digging canals or engaging in manufactures. I should doubt the power of the legislature to compel any man to become a share-holder in such a company w.thout his consent. That is, however, not a question to be decided here. It is not pretended, that the corporation of St. Louis have been authorized to engage or have engaged in undertakings foreign to their duties as a mere municipal corporation.

I do not consider the English cases applicable here. The violations of city charters complained of in that kingdom proceeded from the crown. In the contests between the parliament and the crown, under the Stuarts, the incorporated cities and towns of England were found mostly on the side of the parliament, and the' right of the King to alter or abolish the charters and impose new ones was strenuously resisted by the parliament and ultimately repudiated by the courts. But it was never doubted in England that the parliament—that the three estates could abolish or alter at pleasure the city charters, and although we do not pretend that our legislature possesses the theoretical omnipotence of the British parliament, its powers are certainly more analogous to the actual and acknowledged practical powers of that body than to the prerogatives exercised by the crown.

I conclude then that the act of 1841, for incorporating the city of St. Louis, was a legitimate exercise of legislative power, and in this conclusion I understand my colleagues to concur.

Judge Birch: Without feeling called upon to express any opinion here, respecting the legislative competency to pass the act in question, I concur in the judgment agreed upon by my colleagues.