George W. Allen *et al.*v. Howard Reed *et al., as Board of Election Commissioners of Grant County.*

(Filed March 23, 1900.)

1. Mandamus—*Power to Grant—Appeal From.* Section 9 of the Organic Act confers jurisdiction upon the supreme and district courts of this territory, and the respective judges thereof, to grant writs of *mandamus* in all cases authorized by law. But, there is no provision in our statute that authorizes an appeal or review from the action of the chief justice or one of the associate justices of the supreme court at chambers, in refusing to grant the writ.

2. Same—*Refusal to Grant, Not Bar.* An order refusing to grant an alternative writ of *mandamus* by the chief justice is not a bar to a subsequent application to be made to the supreme court, and where a motion for review has been taken by the relators, from the refusal of such writ, it will be treated and considered in the nature of an original proceeding in this court.

3. County Seat—*Change of.* Section 6 of ch. 23 of the Statutes of 1893, relating to the changing of county seats among other things provides that: "At the election there shall be written or printed on the ballots to be voted for in that county, the words For County Se t,' naming the town desired to be voted for." And hence, where it apears from the petition filed in the office of the county clerk, that it is proposed to .change or remove the county seat to a place and not to a town, the board of election commissioners rightfully refused to recognize such a petition or to give said location, so designated, a place, on the official ballots.

4. Constitutional Law—*Power of Congress Over Territory.* The Congress has plenary legislative power over the people of the territories, and of the departments of the territorial government. Subject to the limitations expressly or by implication imposed by the constitution, the congress has full and complete authority over a territory, and may directly legislate for the government thereof. It has the power to declare a valid law of the territorial legislature void, and a void law valid, regardless of the fact that no such power is expressly or impliedly reserved in the Organic Act.

5. Legislation Regarding County Seats—*Valid, When.* The location and changing of county seats is a legislative function; and is a rightful subject of territorial legislation within the provisions of the Organic Act of this Territory, in the absence of any federal law upon the subject.

6. SAME. But, when congress legislates directly upon any subject for the government of the people of a territory, then it ceases to be a rightful subject of territorial legislation, and any laws enacted by the legislature upon the same subject is void.

7. SAME. Chapter 23 of the Statutes of 1893, relating to the changing of the county seats in this Territory, is inconsistent with the letter and spirit of sections 10 and 14 of the act of congress of March 3, 1893, providing for the opening of the Cherokee Outlet to settlement, inconsistent with the nature and purpose of said act authorizing the secretary of the interior to reserve certain lands for county seat purposes and to locate the county seats thereon, inconsistent with the proclamation of the president declaring said lands open to settlement and designating the seats of county government in the respective counties therein, and is, therefore, void.

(Syllabus by the Court.)

*Original Proceeding in Habeas Corpus.*

*H. I. Wasson* and *Fred M. Elkin*, for relators.

*W. M. Whitelaw* and *D. S. Dill*, and *Joseph Wisby*, for respondents.

STATEMENT OF THE CASE.

On April 5, 1899, the board of county commissioners of Grant county called a special election to be held on May 16, 1899, for the purpose of submitting to the voters of said county the question of changing or relocating the county seat now located at Pond Creek, in said county, under the provisions of ch. 23, of the Statutes of 1893.

It appears that on April 26, 1899, a petition was filed in the office of the county clerk of Grant county, purporting to be signed by fifty-three resident and legal voters of said county, designating the northwest quarter of section 30, township 27 north of range 5, west, in said county, and naming such location "Centerville," as one of the places to be voted for at such special election, for the location of the county seat of said county of Grant,

and requesting that "Centerville" be placed on the certified ballots as a place to be voted for at such special co inty seat election. The board of election commissioners re fused to place or print "Centerville" on the official ballots as a place to be voted for at such special election upon two grounds: (1) That the petition designating the northwest quarter of said section 30, and naming such location "Centerville" and requesting that the same be placed upon the ballots as one of the places to be voted for, fails to state or show that "Centerville" is legally qualified to be voted for at such special election for the county seat, and (2) that there is no such city, town, or village in said county of Grant as "Centerville."

It further appears that prior to the filing and docketing of this case in this court, that an application for a writ of *mandamus* was on May 9, 1899, presented at chambers to the chief justice, and an alternative writ was denied. It further appears that on the following day, May 10, 1899, this proceeding was filed and docketed in this court, and at the same time a motion was filed, asking that this court review the application denying the writ of *mandamus* by the chief justice.

Opinion of the court by

HAINER, J.: The first question that arises in this case is whether the action of the chief justice in denying an alternative writ of *mandamus* presented to him at chambers can be reviewed in this court on motion of the relators.

Section 9, of the Organic Act confers jurisdiction upon the supreme and district courts of this Territory and the respective judges thereof, to grant writs of *mandamus* in all cases authorized by law. There is no provision in our

statute that authorizes an appeal from the action of the chief justice at chambers to the supreme court. Neither is there any statutory provision which authorizes the right or power of this court to review the action of the chief justice or one of the associate justices of the supreme court at chambers, in refusing to grant a writ of *mandamus*. In the absence of such statutory provision, we are of the opinion that no such power exists. But, since an order refusing to grant an alternative writ of *mandamus* by either the chief justice or one of the associate justices is not a bar to a subsequent application to be made to the supreme court, the court will treat and consider the motion and application of the relators in the nature of an original proceeding.

The first contention argued by the respondents is that "Centerville" was ineligible as a county seat candidate under the provisions of the statute relating to the locating and removing of county seats, and that therefore the board of election commissioners properly refused to place or print said place on the official ballots. It is contended that the place upon which "Centerville" was designated is owned wholly by one individual, and that it was wholly unoccupied; that it had no buildings whatever, of any kind or description on it, not even a dwelling house; that no town had been laid out ,or platted on the land, and no rights acquired by any person to occupy said land for a town. And that these facts were well known by the board of election commissioners at the time that they refused to designate said place upon the official ballots.

Section 6, chapter 23, of the Statutes of 1893, relating to this subject, among other things, provides that:

"At the election, there shall be written or printed on the ballots to be voted for in that county, the words 'for county seat,' naming the town desired to be voted for."

Thus the law expressly provides that the ballots to be used shall name the "town" and not the "place" to be voted for as county seat. The elector must give the name of the town for which he desires to vote. He must vote for a "town" and not for a "place," unless that place be a town.

It is true, that in *Conley v. Lawrence*, 14 Kan. 381, the supreme court of Kansas has decided that in the selection of the county seat, the electors are not limited to existing cities and towns, but may choose a site for the new town, and locate the county seat thereon. But, the Kansas statutes under which that decision was rendered and the statutes of this Territory on the same subject are entirely different. The Kansas statute does not provide that the relocation or change of the county seat shall be to a city or a town, but to a place. In *Conley v. Fleming, supra*, the court said:

"If the majority of the electors of the county are unwilling to select any of the existing towns for a county seat, or prefer to choose a new place, and start a new town therefor, we know nothing to prevent them from doing so. Each elector has to give the 'name of the place' for which he votes. This place may be an incorporated city, village, or an unoccupied quarter section."

And hence as it appeared from the petition filed in the office of the county clerk that "Centerville" was designated merely as a place, and not a town to be voted for as the location of the county seat of said county, we are clearly of the opinion that the board of election commissioners rightfully refused to recognize said petition, or to

give said location so designated a place on the official ballots.

But a more serious and graver question confronts us in the determination of this case, as argued and presented by the briefs of counsel for the relators and respondents.

The main question presented for our consideration upon the merits of this cause is: Can the location of the county seat of Grant county be changed under the provisions of chapter 23 of the Statutes of 1893, of this Territory? This is a very important question. Not only on account of the property interests which are involved by the various cities and towns directly concerned, but it also presents to some degree a subject that affects the right of local self government, a right that is peculiarly sacred to every American citizen. The determination of this question involves the construction of the Organic Act, the laws of congress, and the statutes of this Territory, upon the subject of the location and changing of county seats.

Two important questions arise in the consideration of this case: (1) Is the removal of county seats located within the boundaries of what was formerly known as the Cherokee Outlet, a rightful subject of legislation? (2) Is it inconsistent with any law of the United States upon that subject?

It is manifest that if ch. 23, of the Statutes of 1893, is not a rightful subject of legislation, or is inconsistent with the laws of the United States, then the power to change or remove the county seat in Grant county under and by virtue of said act of the territorial legislature is absolutely void. The grant of legislative power of this Territory is vested in sec. 6 of the Organic Act which among other things, provides:

"That the legislative power of the Territory shall extend to all rightful subjects of legislation not inconsistent with the constitution and laws of the United States."

That congress has plenary power over the people of the territories and all departments of territorial government, is no longer a question open to discussion. This power of congress arises as a necessary consequence from the right to acquire and hold additional domain, and may be exercised either by the creation of a separate government with delegated authority to legislate for the people of the Territory, or by the enactment of laws directly by congress without the intervention of such local government. In other words, the territories are not organized under the federal constitution, and derive no part of their legislative or judicial functions from that instrument, but they are solely and exclusively the creatures of congress. Congress, subject to the limitations expressly or by implication imposed by the constitution, has full and complete authority over a territory, and may directly legislate for the government thereof. It has the undoubted power to declare a valid law of the territorial legislature void, and a void law valid, regardless of the fact that no such power is expressly or impliedly reserved in the Organic Act. (*Murphy v. Ramsey*, 114 U. S. 15; *First National Bank v. County of Yankton*, 101 U. S. 129; *Scott v. Sanford*, 19 Howard [U. S.] 393; *Clinton v. Englebrecht*, 13 Wall. [U. S.] 434; *Hornbuckle v. Toombs*, 18 Wall. [U. S.] 648.)

Hence, whenever congress legislates upon any subject directly in relation to the government of the people of the Territory, then it ceases to be a rightful subject of territorial legislation, and any law that the legislature of the territory has enacted or enacts upon the same subject which congress has assumed to legislate upon, is inconsist-

ent with such laws of the United States, and is, therefore, void. The location or changing of county seats is a legislative function. That it is a rightful subject of territorial legislation within the provisions of the Organic Act is indisputable, in the absence of any federal law upon the subject.

It is also true that the general history of the various territorial governments, shows that the location or changing of county seats has not been the policy of congress until recent years, and has been uniformly held by the courts as a rightful subject of territorial legislation. But notwithstanding the fact that this has been the uniform policy of congress, and that such legislation has been upheld by the highest courts of the land, no valid reason can be suggested why congress in its wisdom should not change that policy. This change of policy manifestly appears upon a careful examination of the congressional legislation upon this subject during the past thirteen years.

On July 30, 1886, congress enacted a law that the legislatures of the territories of the United States now or hereafter to be organized, shall not pass local or special laws relating to the locating or changing of county seats. (24 United States Statutes at Large, 170.)

On July 19, 1888, congress enacted the following law:

"That the act of the legislative assembly of the Territory of New Mexico, passed February twenty-fourth, eighteen hundred and eighty-seven, entitled, 'An Act Creating the County of San Juan,' be, and the same is hereby ratified and confirmed."

Section 2 of said act reads as follows:

"That nothing in the act approved July 30th, eighteen hundred and eighty-six, entitled an act 'To Prohibit the Passage of Local or Special Laws in the Territories of the

United States, to Limit Territorial Indebtedness and for Other Purposes,' shall be construed to prohibit the creation by territorial legislature of new counties and the location of the county seats thereof." (25 United States Statutes at Large, page 336.)

On May 2, 1890, congress in sec. 4 of the Organic Act of this Territory, among other things provided:

"That for the purpose of facilitating the organization of a temporary government in the Territory of Oklahoma, seven counties are hereby established therein to be known until after the first election in the Territory, as the First county, the Second county, the Third county, the Fourth county, the Fifth county, and the Sixth county, the boundaries of which shall be fixed by the governor of the Territory until otherwise provided by the legislative assembly thereof. The county seat of the First county shall be at Guthrie. The county seat of the Second county shall be at Oklahoma City. The county seat of the Third county shall be at Norman. The county seat of the Fourth county shall be at El Reno. The county seat of the Fifth county shall be at Kingfisher City. The county seat of the Sixth county shall be at Stillwater. The Seventh county shall embrace all that portion of the Territory lying west of the one hundredth meridian, known as the Public Land Strip, county seat of which shall be at Beaver: Provided, That the county seats located by this act may be changed in such manner as the territorial legislature may provide." (26 United States Statutes at Large, 83.)

On March 3, 1891, congress under section 17 of the act opening the Cheyenne and Arapahoe country to settlement, declared:

"That before any lands in Oklahoma are open to settlement it shall be the duty of the secretary of the interior to divide the same into counties which shall contain as near as possible not less than nine hundred square miles in each county. In establishing said county line, the secretary is hereby authorized to extend the lines of the coun-

ties already located so as to make the area of said counties equal as near as may be, to the area of the counties provided for in this act. At the first election for county officers the people of each county may vote for a name for each county, and the name which receives the greatest number of votes shall be the name of the county: Provided, further, That as soon as the county lines are designated by the secretary, he shall reserve not to exceed one-half section of land in each county to be located near the center of said county, for county seat purposes, to be entered under sections twenty-three hundred and eighty-seven and twenty-three hundred and eighty-eight of the Revised Statutes." (26 United States Statutes at Large, 1206.)

On March 3, 1893, congress in opening the Cherokee Outlet to settlement, in sec. 10, of said act, among other things, provided that:

"The president of the United States is hereby authorized, at any time within six months after the approval of this act and the acceptance of the same by the Cherokee Nation as herein provided, by proclamation, to open to settlement any or all of the lands not allotted or reserved, in the manner provided in section thirteen of the act of congress approved March 2, eighteen-hundred and eighty-nine, entitled, 'An Act Making Appropriations for the Current and Contingent Expenses of the Indian Department and for Fulfilling Treaty Stipulations with the Various Indian Tribes, for the Year Ending June Thirtieth, Eighteen Hundred and Ninety, and for Other Purposes.' (Twenty-fifth United States Statutes, page ten hundred and five); and also subject to the provisions of the act of congress approved May second, eighteen hundred and ninety, entitled, 'An Act to Provide a Temporary Government for the Territory of Oklahoma, to Enlarge the Jurisdiction of the United States Court in Indian Territory, and for Other Purposes'; also, subject to the second proviso of section seventeen, the whole of section eighteen of the act

of March third, eighteen hundred and ninety-one, entitled, 'An Act Making Appropriations for the Current Expenses of the Indian Department, and for Fulfilling Treaty Stipulations with Various Indian Tribes, for the Year Ending June Thirtieth, Eighteen Hundred and Ninety-Two, and for Other Purposes'; except as to so much of said acts and sections as may conflict with the provisions of this act." (27 United States Statutes at Large, page 642.)

Section fourteen of said act reads as follows:

"Before any of the aforesaid lands are open to settlement it shall be the duty of the secretary of the interior to divide the same into counties which shall contain as near as possible not less than five hundred square miles in each county. In establishing said county line the secretary is hereby authorized to extend the lines of the counties already located so as to make the area of said counties equal, as near as may be, to the area of the counties provided for in this act: Provided, That range one west and ranges one, two, three and four east in township 20, shall be attached to, and become a part of Payne county. At the first election for county officers the people of each county may vote for a name for each county, and the name which receives the greatest number of votes shall be the name of such county: Provided, further, That as soon as the county lines are designated by the secretary he shall reserve not to exceed one-half section of land in each county, to be located for county seat purposes, to be entered under sections twenty-three hundred and eighty-seven and twenty-three hundred and eighty-eight of the Revised Statutes. And all reservations for county seats shall be specified in any order or proclamation which the president shall make for the opening of the lands to settlement." (27 United States Statutes at Large, page 645.)

The president's proclamation opening the Cherokee Outlet to settlement on September 16, 1893, among other things proclaimed that:

"Whereas, the thirteenth section of the act approved March second, eighteen hundred and eighty-nine, the act approved May second, eighteen hundred and ninety, and the second proviso of section seventeen, and the whole of section eighteen of the act approved March third, eighteen hundred and ninety-one, are referred to in the tenth section of the act approved March third, eighteen hundred and ninety-three, and thereby made applicable in the disposal of the lands in the 'Cherokee Outlet' hereinbefore mentioned, the provisons of which acts, so far as they affect the opening to settlement and the disposal of said lands, are more particularly set forth hereinafter in connection with the rules and regulations prescribed by the secretary of the interior for the occupation and settlement of the lands hereby opened, according to said tenth section; and

"Whereas, the lands acquired by the three several agreements hereinbefore mentioned have been divided into counties by the secretary of the interior, as required by said last mentioned act of congress, before the same shall be opened to settlement, and lands have been reserved for county seat purposes to be entered under sections twenty-three hundred and eighty-seven, and twenty-three hundred and eighty-eight of the Revised Statutes of the United States as therein required as follows, to-wit: * * * For County L, the southwest quarter of section one, and the southeast quarter of section two, township twenty-five north of range six west of the Indian Meridian, excepting four acres reserved for the site of a court house to be designated by lot and block upon the official plat of survey of said reservation for county seat purposes hereafter to be issued by the commissioner of the general land office; said reservation to be additional to the reservations for parks, schools and other public purposes required to be made by section 22, of the act of May 2, 1890." (28 United States Statutes at Large, pages 1225 and 1226.)

The foregoing acts embrace all the legislation by congress upon this subject. It will thus be seen that the first

express declaration by congress upon the subject of county seats is to be found in the act of July 30, 1886, which prohibits the locating or changing of county seats by the territorial legislature by local or special acts. The next declaration upon this subject is the act of July 19, 1888. The next reference to the subject is in sec. 4, of the Organic Act of this Territory. By the terms of this act the county seats of the seven original counties in Oklahoma were located. Here for the first time congress has specifically and affirmatively located county seats in a territory.

In the absence of any declaration by congress that such location is merely temporary, it must be regarded and construed as a permanent location of the seat of county government, at least so long as the territorial form of government is maintained. That congress considered it so, is apparent from the language of the act itself, which contained a proviso expressly authorizing the territorial legislature to change the county seats so located. This proviso reads as follows:

"Provided, That the county seats located by this act may be changed in such manner as the territorial legislature may provide."

This proviso is clear and emphatic in its scope and operation. It clearly limits the removal or changing of county seats located by the terms and provisions of the Organic Act. But, even if by its terms it did not limit the removal of county seats to those named in the Organic Act, the settled rule of construction restricts the effect of a proviso to the clause immediately preceding it.

In *Leader Printing Company v. The Territory*, 6 Okla. 302, this court held that a proviso or exception in a stat-

ute relates to the paragraph or distinct portion of the enactment which immediately precedes it, unless the contrary intention is clearly apparent from the statute.

Mr. Sutherland in his work on Statutory Construction, in sec. 223, lays down the rule as follows:

"The natural and appropriate office of the proviso being to restrain or qualify some preceding matter, it should be confined to what precedes it, unless it clearly appears to have been intended to apply to some other matters. It is to be construed in connection with the section of which it forms a part, and it is substantially an exception. If it be a proviso to a particular section, it does not apply to others, unless plainly intended. It should be construed with reference to the immediately preceding parts of the clause to which it is attached."

The act opening the Cheyenne and Arapahoe country to settlement by congress, expressly provided for the location of county seats and the establishment of county boundaries. It also authorized the secretary of the interior to extend the lines of the counties already located, so as to make the area of said counties equal, as near as may be, to the area of the counties provided in said act. It also provided that the county seats in each county should be located near the center of the county. It will be observed that this act opening the Cheyenne and Arapahoe country to settlement does not contain the provision that it is opened subject to the act of May 2, 1890, (that is, the Organic Act of this Territory,) and it cannot be contended that the proviso in section four of the Organic Act in reference to county seats is applicable to this act. Hence, the argument of counsel for respondents that the county seats in the seven original counties may be changed by the act of the legislature and that the same

act must therefore be applicable to the newly organized counties, has no force and effect.

And again, the act of congress opening the Cherokee Outlet to settlement in relation to the location of county seats and fixing the boundaries of the counties by congress was simply carrying out the policy adopted in opening the Cheyenne and Arapahoe country to settlement. This act expressly provides that the secretary of the interior shall divide the lands open to settlement into counties which shall contain as near as possible not less than five hundred square miles in each county and in establishing such county lines the secretary is also authorized to extend the line of counties already located so as to make the area of such county equal as near as may be to the area of the counties then to be opened to settlement; and that the county seats shall be designated by the secretary of the interior, and that he shall reserve not to exceed one-half section of land in each county to be located for county seat purposes, and that all reservations for county seats shall be specified in any order or proclamation which the president shall make for the opening of the lands to settlement.

In pursuance to this act of congress, the president of the United States in his proclamation in opening the Cherokee Outlet to settlement on September 16, 1893, designated certain lands for county seat purposes, to-wit: For County L (now Grant county,) the southwest quarter of section one, and the southeast quarter of section two, township twenty-five, north of range six west of the Indian Meridian, excepting four acres reserved for the site of a court house, to be designated by lot and block upon the official plat of said survey of said reservation for county seat purposes, hereafter to be issued by the commissioner

of the general land office; said reservation to be additional to the reservation for parks, schools and other public purposes, required to be made by sec. 22 of the act of May 2, 1890.

How could language more clearly express the intent and purpose of congress to definitely and permanently locate the county seats? But it is ably argued by counsel for the respondents that the location of county seats in the respective counties of the Cherokee Outlet, and the reservation of lands therefor by congress, was for the purpose of facilitating and providing merely a temporary seat of government for the inhabitants thereof, until such time as the territorial legislature in its wisdom may deem proper to change or relocate the same.

But upon examination of the various acts of congress upon this subject, it will be observed that in each instance where congress has intended that its acts should remain in force only for a limited period, or until action should be taken by the territorial legislature, it invariably has used language clearly and unmistakably indicating such intention. This is true not only of the Organic Act of this Territory, but of all legislation by congress in respect to territorial legislation. Thus, when congress adopted the Organic Act of this Territory, and put in force the laws of Nebraska, it expressly declared that they should remain in force until after the adjournment of the first session of the legislative assembly of said Territory. When congress by sec. 15, of the Organic Act located and established the seat of government for the Territory, it expressly provided the mode and manner in which it could be changed by the governor and the legislative assembly.

So, by sec. 7 of the Organic Act the governor was authorized in the first instance to appoint the various of-

ficers of the Territory, and thereafter such power was to be vested in the legislature. So, by section 23 of the Organic Act, making reservations for certain public highways, provision was made that such·highways may be vacated by "any competent authority," thus permitting the legislature to make provision for the manner of vacating such highways.

These various provisions then clearly establish the fact that when congress enacts any law which it intends to be of a temporary character, it expressly so states in the act itself. And when it does not use such language in the act itself, it is manifestly the intent and purpose of congress that such a measure shall remain in force until it is modified or repealed by that body.

But again, it is earnestly contended by counsel for respondents, that the act of congress opening the Cherokee Outlet to settlement expressly provided that it should be opened subject to the Organic Act, and being opened subject to the Organic Act it necessarily put in force proviso 1. of sec. 4. of said act.

It is true that the act of congress in declaring the Cherokee Outlet open to settlement did use the term "subject to the act of May 2, 1890." (that is, the Organic Act of Oklahoma). But a careful examination of the act and the president's proclamation issued in pursuance thereof, clearly discloses the fact that the words were used in relation to the disposal of public lands, and had no reference whatever to the subject of county seats now under consideration. This construction is clearly apparent when it is remembered that sec. 1 of the Organic Act provides that:

"Whenever the interest of the Cherokee Indians in the land known as the Cherokee Outlet shall have been extinguished and the president shall make proclamation thereof, said Outlet shall thereupon and without further legislation become à part of the Territory of Oklahoma."

Hence, when the Cherokee Outlet was opened to settlement by the proclamation of the president it *eo instanti* became a part of the Territory òf Oklahoma, and subject to all the provisions of the Organic Act, except so far as it was in conflict with this act. And when congress in sec. 10 of said act, used the words, that the Cherokee Outlet shall be opened, among other things, "subject to the Organic Act," it undoubtedly had reference to the mode and manner of disposing of public lands. And, moreover, section 10 of said act, contains the following exceptions: "Except as to so much of said acts and sections as may conflict with the provisions of this act."

This exception could have only been intended for one purpose, and that is, that the Cherokee Outlet was opened to settlement subject to the provisions of the Organic Act, except so far as it conflicted in any wise with the provisions of this act. The contention, therefore, that proviso 1 of sec. 4 of the Organic Act is applicable, is clearly untenable.

These various acts of congress fixing the boundaries of the counties and locating the county seats therein, are in clear and unmistakable terms. There is nothing in these acts that indicates that it was the intent and purpose of congress to make them temporary, or that they could be changed by any act of the territorial legislature. Then by what right or power can these county seats be changed or removed from their present location? Can they be changed or removed by virtue of an act of the ter-

ritorial legislature? Can the laws of the territorial legislature supersede or nullify the acts of congress? These questions must be emphatically answered in the negative. The rule is well settled by an unbroken current of decisions of the supreme court of the United States, that where the subject of legislation is within both the legislative power of the United States and of a state or territory, the exercise of such power by congress precludes the authority of the legislature to exercise such power. As early as 1824, in construing the federal constitution, the question arose whether the power of congress to regulate foreign and interstate commerce is exclusive, or whether the states have concurrent authority to any extent over the same subject.

In *Gibbon v. Ogden*, 9 Wheaton, 1, Chief Justice Marshall, in discussing this subject said:

"The sole question is, can a state regulate commerce with foreign nations and among the states, while congress is regulating it?

\* \* \* It has been contended that, if a law passed by a state, in the exercise of its acknowledged sovereignty, comes into conflict with a law passed by congress in the pursuance of the constitution, they affect the subject, and each other like equal opposing powers. But the framers of our constitution foresaw this state of things, and provided for it by declaring the supremacy not only of itself, but of the laws made in pursuance to it. The nullity of any act inconsistent with the constitution is produced by the declaration that the constitution is the supreme law. The appropriate application of that part of the clause which confers the same supremacy on laws and treaties is to such acts of the state legislatures as do not transcend their powers, but, though enacted in the execution of acknowledged state powers, interfere with, or are contrary to the laws. In every case, the act of congress or the

treaty is supreme, and the law of the state, though enacted in the exercise of powers not controverted, must yield to it."

In *Wilson v. Blackbird Creek, Marsh County,* 2 Peters, 245, Chief Justice Marshall speaking upon  this  subject used the following language:

"If congress had passed any act which bore upon the case; any act in execution of the power to regulate commerce, the object of which was to control state legislation over those small navigable creeks into which the tide flows, and which abound throughout the lower country of the middle and southern states; we should feel not much difficulty in saying that a state law coming in conflict with such act would be void."

In *Cooley v. Wardens of Philadelphia,* 12 Howard 299, the supreme court of the United States declared that:

"The grant of commercial power to congress does not contain any terms which expressly exclude the states from exercising an authority over its subject matter. If they are excluded, it must be because the nature of the power thus granted to congress requires that  a  similar authority should not exist in the states.   *   *   *   It is not the mere existence of such a power, but its exercise by congress, which may be incompatible with the exercise of the same power by the states, and that the states may legislate in the absence of congressional regulations."

The power of congress to enact uniform laws upon the subject of bankruptcy does not deprive the states or territories of the power to pass laws dealing with the same subject, when there is no national bankruptcy law in existence.   But, as soon as congress adopts a measure of this character, all state and territorial laws relating to bankruptcy or insolvency are thereby superseded and suspended until the national law shall be repealed.

In discussing this subject Chief Justice Marshall, in *Sturges v. Crowninshield,* 4 Wheaton 122, lays down the following rule:

"It has been said, that congress has exercised this power; and, by doing so, has extinguished the power of the states which cannot be revived by repealing the law of congress. We do not think so. If the right of the states to pass a bankrupt law is not taken away by the mere grant of that power to congress, it cannot be extinguished; it can only be suspended, by the enactment of a general bankrupt law. The repeal of that law cannot, it is true, confer the power on the states; but it removes a disability to its exercise, which was created by the act of congress."

The states have power to legislate on the subject of militia. Congress is vested with the same power. In the case of *Houston v. Moore,* 5 Wheaton, 1, a question arose as to whether a member of the state militia could be punished by court martial under the laws of his state, while called into the service of the United States under laws of congress. Mr. Justice Washington asserts the doctrine that laws need not be repugnant or inconsistent in order to render the state law inoperative, but the exercise of the power by the superior power excludes the right of the inferior power to exercise such right. In this case he says:

"Congress has power to provide for organizing, arming and disciplining the militia; and it is presumable that the framers of the constitution contemplated a full exercise of all these powers. Nevertheless, if congress had declined to exercise them, it was competent to the state governments to provide for organizing, arming and disciplining their respective militia, in such manner as they might think proper. But congress has provided for all these subjects, in the way which that body must have

supposed the best calculated to promote the general welfare, and to provide for the national defense. After this, can the state governments enter upon the same ground— provide for the same objects as they may think proper, and punish, in their own way, violations of the laws they have so enacted? The affirmative of this question is asserted by the defendant's counsel, who, it is understood, contend that unless such state laws are in direct contradiction to those of the United States, they are not repugnant to the constitution of the United States.

"From this doctrine I must, for one, be permitted to dissent. The two laws may not be in such absolute opposition to each other, as to render the one incapable of execution, without violating the injunctions of the other; and yet, the will of the one legislature may be in direct collision with that of the other. This will is to be discovered as well by what the legislature has not declared, as by what they have expressed. Congress for example, has declared, that the punishment for disobedience of the act of congress, shall be a certain fine; if that provided by the state legislature for the same offense be a similar fine, with the addition of imprisonment or death, the latter law would not prevent the former from being carried into execution, and may be said, therefore, not to be repugnant to it. But surely the will of congress is, nevertheless, thwarted and opposed.

"This question does not so much involve a contest for power between the two governments, as the rights and privileges of the citizen, secured to him by the constitution of the United States, the benefits of which he may lawfully claim.

"If, in a specified case, the people have thought proper to bestow certain powers on congress as the safest depository of them, and congress has legislated within the scope of them, the people have reason to complain that the same powers should be exercised at the same time by the state legislatures. To subject them to the operation

of two laws upon the same subject, dictated by distinct wills, particularly in a case inflicting pains and penalties, is, to my apprehension, something very much like oppression, if not worse. In short, I am altogether incapable of comprehending how two distinct wills can, at the same time, be exercised in relation to the same subject, to be effectual, and at the same time compatible with each other. If they correspond in every respect, then the later is idle and inoperative; if they differ, they must, in the nature of things, oppose each other, so far as they do differ. If the one imposes a certain punishment for a certain offense, the presumption is, that this was deemed sufficient, and, under all circumstances, the only proper one. If the other legislature impose a different punishment, in kind or degree, I am at a loss to conceive how they can both consist harmoniously together.

"I admit that a legislative body may, by different laws, impose upon the same person, for the same offense, different and cumulative punishments; but then it is the will of the same body to do so, and the second, equally with the first, is the will of that body. There is, therefore, and can be, no opposition of wills. But the case is altogether different, where the laws flow from the wills of distinct, co-ordinate bodies.

"This course of reasoning is intended as an answer to what I consider a novel and unconstitutional doctrine, that in cases where the state governments have a concurrent power of legislation with the national government, they may legislate upon any subject on which congress has acted, provided the two laws are not in terms, or in their operation, contradictory and repugnant to each other.

"Upon the subject of the militia, congress has exercised the powers conferred on that body by the constitution, as fully as was thought right, and has thus excluded the power of legislation by the states on these subjects execpt so far as it has been permitted by congress, although it should be conceded, that important provisions

have been omitted, or that others which have been made might have been more extended, or more wisely devised."

And, again the authority vested in congress by the constitution of the United States to fix standards of weights and measures is another illustration of the powers which were deemed proper to be confided to the national legislature for the purpose of securing uniformity on account of the relation to trade and commerce. So far, however, nothing has been done by congress in the execution of this power except to provide a standard troy pound for the regulation of the coinage, and to pass a permissive statute for the use of the metric system throughout the United States. In the meantime, and until congress shall act, each state or territory has the right and power to adopt its own standard for the regulation of weights and measures. But, if congress should at any time proceed to adopt a uniform national system, all state or territorial laws, to the extent that they might be inconsistent herewith, would be suspended and superseded.

Applying these well settled principles to the case under consideration, we must come to the conclusion that the subject of fixing the boundaries of the counties of this Territory, and the location and changing of the county seats therein, is a rightful subject of legislation under the Organic Act until such time as the national legislature legislates or enacts a law upon that subject. But, when congress legislates upon the subject, as it clearly appears from the various enactments heretofore quoted in this opinion, then that subject ceases to be a rightful subject of legislation, and is inconsistent and incompatible with the laws of the United States. And it must therefore follow, that any

act passed by the legislature upon the same subject is suspended and superseded, until the law of congress is modified or repealed. In other words, any law enacted by the inferior body upon the same subject must yield to the superior power.

We are clearly of the opinion that ch. 23 of the Statutes of 1893 of this Territory, is inconsistent with the letter and spirit of secs. 10 and 14 of the act of congress of March 3, 1893, providing for the opening of the Cherokee Outlet to settlement, inconsistent with the nature and purpose of said act authorizing the secretary of the interior to reserve certain lands for county seat purposes and to locate county seats thereon, and inconsistent with the proclamation of the president declaring said lands open to settlement and designating the seats of county government in the respective counties therein.

We, therefore, hold that the act of the territorial legislature providing for the changing of county seats, so far as it affects the lands opened to settlement by the act of congress of March 3, 1893, and embraced in what was formerly known as the Cherokee Outlet is void.

The peremptory writ of *mandamus* is, therefore, refused. The costs of this proceeding are taxed to the relators.

Burford, C. J., concurs fully; Burwell, J., concurs in the result, but not as to the reasoning; McAtee, J., and Irwin, J., concurring in the judgment of the court, but upon different grounds, and dissenting from the reasoning of the majority opinion.

Separate opinion by

McAtee, J.: The case involves a consideration of the acts of congress under which the Territory of Oklahoma

has been organized, of the purpose of congress and the comprehensiveness of its legislation in providing for the government of the Territory.

It was provided by the Organic Act, sec. 6, passed May 2d, 1890, that:

"The legislative power of the territory shall extend to all rightful subjects of legislation, not inconsistent with the constitution and laws of the United States, but no law shall be passed interfering with the primary disposal of the soil, no taxes shall be imposed on the property of the United States, nor shall the lands or other property of non-residents be taxed higher than the lands or other property of residents, nor shall any law be passed impairing the right to private property, nor shall any unequal discimination be made in taxing different kinds of property, but all property subject to taxation shall be taxed in proportion to its value."

The purpose and comprehensiveness of this provision was treated with considerable care by Chief Justice Chase in 1872, in the case of *Clinton et al. v. Englebrecht et al.* 13 Wall. 434, in which he took occasion to review to some extent the history of the legislation by which congress had up to that time organized the various territories which were in process of preparation for the condition of statehood, and the relative authority of territorial laws enacted subsequently to their organization as territories by the congressional enactment, and by the passage of the several organic acts under which these organizations were effected.

And it was said in that case, that:

"The theory upon which the various governments for portions of the territory of the United States have been organized, has ever been that of leaving to the inhabitants all the powers of self government consistent with the supremacy and supervision of national authority, and

with certain fundamental principles established by congress."

He reviewed in the opinion the various ordinances adopted by congress providing for the government of the territories beginning with that of 1787 for the Northwest Territory, in which "it provided for the appointment of the governor and three judges of the court, who are authorized to adopt for the temporary government of the district, such laws of the original states as might be adapted to its circumstances."

And speaking thereafter of the territories, up to the organization of the territory of Missouri, he said, speaking of the manner and purpose with which congress had theretofore acted, that:

"In all the territories full power was given to the legislature over all ordinary subjects of legislation. The terms in which it was granted were various, but the import was the same in all."

He then went on to say, that:

"In 1836 the territory of Wisconsin was organized under an act which seems to have received full consideration, and from which all subsequent acts for the organization of territories have been copied, with few and inconsiderable variations. Except those in the Kansas and Nebraska acts in relation to slavery, and some others growing out of local circumstances, they all contained the same provisions in regard to the legislature and the legislative authority, and to the judiciary and the judicial authority, as the act organizing the territory of Utah.

"The language of the section conferring the legislative authority in each of these acts is this:

" 'The legislative power of said Territory shall extend to all rightful subjects of legislation, consistent with the constitution of the United States and the provisions of this act; but no law shall be passed interfering

with the primary disposal of the soil. No tax shall be imposed upon the property of the United States, nor shall the lands or other property of non-residents be taxed higher than the lands or other property of residents.' "

And it was said in *Hornbuckle v. Toombs*, 13 Wall. 648, by the supreme court of the United States, that:

"As a general thing subject to the general scheme of local government chalked out by the Organic Act and such provisions as are contained therein, the local legislature has been entrusted with the enactment of the entire system of municipal law, subject also, however, to the right of congress to revise, alter and revoke at its discretion. The powers thus exercised by the territorial legislature are entirely as extensive as those exercised by any state legislature."

Sixteen years later the supreme court of the United states, by Justice Field, in the cast of *Maynard v. Hill*, 125 U. S. 204, said that:

"What were 'rightful subjects of legislation,' when these acts organizing the territories were passed, is not to be settled by reference to the distinctions usually made between legislative acts and such as are judicial or administrative in their character, but by an examination of the subjects upon which legislatures had been in the practice of acting with the consent and approval of the people they represented. A long acquiescence in repeated acts of legislation on particular matters is evidence that those matters have been generally considered by the people as properly within legislative control. Such acts are not to be set aside or treated as invalid, because, upon a careful consideration of their character, doubts may arise as to the competency of the legislature to pass them. Rights acquired, or obligations incurred under such legislation, are not to be impaired because of subseqeuent differences of opinion as to the department of government to which the acts are properly assignable. * * * It will be found from the history of legislation

that, while a general separation has been observed between the different departments, so that no clear encroachment by one upon the province of the other has been sustained, the legislative department, when not restrained by constitutional provisions and a regard for certain fundamental rights of the citizen which are recognized in this country as the basis of all government, has acted upon everything within the range of civil government. (*Loan Ass'n v. Topeka*, 20 Wall. 633.) Every subject of interest to the community has come under its direction. It has not merely prescribed rules for future conduct, but has legalized past acts, corrected defects in proceedings, and determined the status, conditions and relations of parties in the future."

The supreme court of the United States having thus declared that a long acquiescence in repeated acts of legislation upon particular matters was sufficient evidence that those matters were generally considered by the people as properly within legislative control, and since it will be admitted, without argument or citation of example, that legislation and the enactment of election laws by legislatures through the common practice of the various states of the union in enacting such laws, which have been approved by the people through their representatives, is a rightful subject of legislation, and since the supreme court had also expressly declared that "it has ever been the theory upon which the territories have been organized that all the powers of self-government consistent with the supremacy and supervision of national authority, should be left to the inhabitants of the territories themselves," and that "the legislative department, when not restrained by constitutional provisions, and the fundamental rights of the citizen, has acted upon everything within the range of civil government," and that "the powers thus exercised by the territorial legislatures are

entirely as extensive as those exercised by any state legislature" it was but natural and to be expected that the people of the territories would, looking to their own comfort and to their own rights in the matter, enact legislation which should provide in their best judgment for the location of county seats to suit their own convenience. and such has been the common practice in the territories.

When the territory of Wyoming was organized, it embraced within its territorial limits, as one county, all the territory which was, by an act of the territorial legislature, subsequently divided into three separate counties. The supreme court of the United States, in the case of *County Commissioners of Laramie Co. v. County Commissioners of Albany Co.,* 92 U. S. 307, in 1876, sanctioned this legislative act of the territory of Wyoming, Judge Clifford delivering the opinion of the court, and saying that:

"Corporations of the kind (counties) are properly denominated public corporations, for the reason that they are but parts of the machinery employed in carrying on the affairs of the state, and it is well settled law, that the charters under which such corporations are created may be changed, modified or repealed, as the exigencies of the public service or the public welfare may demand. (2 Kent Com. 12th Ed. 305; Ang. & A. Corp. 10th Ed. sec. 31; *McKim v. Odom,* 3 Bland. 407; *St. Louis v. Allen,* 13 Mo. 400; *The Schools v. Tatman,* 13 Ill. 27; *N. Yarmouth v. Skillings,* 45 Me. 141.)

"Such corporations are composed of all the inhabitants of the territory included in the political organization; and the attribute of individuality is conferred on the entire mass of such residents, and it may be modified or taken away at the mere will of the legislature. according to its own views of public convenience, and with-

out any necessity for the consent of those composing the body politic. (1 Greenl. Ev. 12th Ed. sec. 331.)

"Corporate rights and privileges are usually possessed by such corporations; and it is equally true that they are subject to legal obligations and duties, and that they are under the entire control of the legislature, from which all their powers are derived. * * *"

"Institutions of the kind, whether called counties or towns, are the auxiliaries of the state in the important business of municipal rule, and cannot have the least pretention to sustain their privileges or their existence upon anything like a contract between them and the legislatures of the states, because there is not and cannot be any reciprocity of stipulation, and their objects and duties are utterly incompatible with everything of the nature of compact. * * * Opposition is sometimes manifested; but it is everywhere acknowledged that the legislature possesses the power to divide counties and towns at their pleasure, * * *. Political subdivisions of the kind are always subject to the general laws of the state. * * * Such corporations are the mere creatures of the legislative will; and, inasmuch as all their powers are derived from that source, it follows that those powers may be enlarged, modified or diminished at any time, without their consent, or even without notice. They are but subdivisions of the state, deriving even their existence from the legislature. Their officers are nothing more than local agents of the state; and their powers may be revoked or enlarged and their acts may be set aside or confirmed at the pleasure of the paramount authority, so long as private rights are not thereby violated. (*Russel v. Reed*, 27 Pa. St. 170.)

"Civil and geographical division of the state into counties, townships and cities," said Thompson, C. J., "had its origin in the necessities and convenience of the people; but this does not withdraw these municipal divisions from the supervision and control by the state in matters of internal government. * * * There must, in

the nature of things, be reserved, by necessary implication, in the creation of such corporations, a power to modify them in such manner as to meet the public exigencies. Alterations of the kind are often required by public convenience and necessity. * * * Cases doubtless arise where injustice is done by annexing part of one municipal corporation to another, or by the division of such a corporation and the creation of a new one, or by the consolidation of two or more such corporations into one of larger size Examples illustrative of these suggestions may easily be imagined."

And again, the legislature of the territory of Montana, acting under a provision of the organic act of that territory, providing that they might legislate upon "all rightful subjects of legislation," passed an act in 1883 "authorizing the citizens of Jefferson county to vote upon the question of removing the county seat of said county from Radersburg to Boulder City," and providing for the election.

The validity of the election was sustained by the supreme court of that territory, under the election law of the territory, the court saying that:

"If there is a fair vote and an honest count, the qualified voters must not be disfranchised by having the election declared void, because the officers conducting the same were not duly sworn or chosen, or were not qualified for the office or for any technical irregularity," and that: "The great question is whether the voice of the majority has been honestly and fairly expressed," and "the question is, was there a fair vote and an honest count." (*Wells et al., v. Taylor*, 3 Pac. 255).

The legislature of the territory of Arizona enacted a law, which was approved February 25, 1885, in which it was provided, that:

"The qualified voters of Mohave county should at the next general election designate by ballot the locality for the county seat of said county."

The act was sustained by the supreme court of that territory, the court saying, that:

"One question we must dispose of at the threshold. It has been urged with great force and ability that the law authorizing the election is invalid in that it attempts to delegate legislative powers to the voters of Mohave county. The location of a county seat should be determined by the people of a county. Their interests and convenience should alone be consulted. So, in most of the states, laws have been enacted by which a vote of the people should determine the question. No case has been cited that decides such laws to be invalid. They have been acquiesced in by the courts and the law makers too long now to question their validity." (*Territory v. Board of Supervisors of Mohave Co.*, 12 Pac. 730; citing, *Calaveras Co. v. Brockway*, 30 Cal. 326; *State v. Stearns*, 11 Neb. 104; *Boren v. Smith*, 47 Ill. 482.)

The legislature of the territory of Wyoming having enacted a law to divide one county into three, which was special and local legislation, and the supreme court of the United States having ratified and sanctioned this act, and the legislature of the territory of Montana having, in 1883, passed an act authorizing the citizens of Jefferson county to vote upon the question of removing the county seat of said county from Radersburg to Boulder City, which was special and local legislation, and the legislature of the territory of Arizona having in February, 1885, enacted that the qualified voters of Mohave county should be authorized to hold a similar election to determine the locality for the county seat of said county, and this legislation having been approved in one instance by the supreme court of the United States and in the other two

instances by the supreme courts of those territories, as lawful, under the organic act of those territories, providing that the legislative power of the territory should "extend to all rightful subjects of legislation, not inconsistent with the constitution and laws of the United States," congress thereafter, on the 30th day of July, 1886, put an end to such special and local legislation by enacting, that:

"The legislatures of the territories of the United States now or hereafter to be organized, shall not pass local or special laws in any of the following enumerated cases, that is to say:     *   *   *   locating   or   changing county seat;   *   *   *." (24 U. S. Stat. at Large, 170.)

And thereby conceding, so far as congress could concede, without another express declaration upon the subject, that while the legislatures of the territories should be prohibited thenceforth from enacting a special election law for any particular county of the territory, and should be prohibited from legislation locating the county seat of any particular county, that it would no farther than that interfere with the interests and convenience of the people in passing a general election law with respect to the location of county seats of the territories which the legislatures of the territories had theretofore uniformly conceded to have the power to enact under the provision that:   "The legislative power of the territory shall extend to all rightful subjects of legislation, not inconsistent with the constitution and laws of the United States."

Such was the law as contained in the organic act of the territories generally, including Montana and Arizona, the legislative acts thereunder by the   legislatures   of those territories, enacting local and   special   legislation concerning the removal of county seats, the construction

of their supreme courts upon it and the provisions made by congress, in which, while it carefully provided that the legislatures of the territories of the United States "should not pass local or special laws * * * locating or changing county seats," it refrained from an enactment which would have prohibited the legislatures of the territories from passing general election laws, but permitted the right to pass those laws to remain in the territorial legislatures where they had been, by the uniform construction of the territorial courts and the supreme court of the United States, conceded to be, and thereupon congress passed the Organic Act for this Territory, May 2, 1890, Statutes of 1893, p. 38, sec. 1, in which it was provided, that:

"Whenever the interest of the Cherokee Indians in the land known as the Cehrokee Outlet shall have been extinguished and the president shall make proclamation thereof, said outlet shall thereupon and without further legislation become a part of the Territory of Oklahoma."

And by section four:

"That for the purpose of facilitating the organization of a temporary government in the Territory of Oklahoma, seven counties are hereby established therein, to be known, until after the first election in the Territory, as the First county, the Second county, the Third county, the Fourth county, the Fifth county and the Sixth county, the boundaries of which shall be fixed by the governor of the territory until otherwise provided by the legislative assembly thereof. The county seat of the First county shall be at Guthrie. The county seat of the Second county shall be at Oklahoma City. The county seat of the Third county shall be at Norman. The county seat of the Fourth county shall be at El Reno. The county seat of the Fifth county shall be at Kingfisher City. The sixth county seat shall be at Stillwater. The Seventh county

shall embrace all that portion of the Territory lying west
of the one hundredth meridian, known as the Public Land
Strip, the county seat of which shall be at Beaver: Pro-
vided, that the county seats indicated by this act may be
changed in such manner as the territorial legislature may
provide."

The portion of Oklahoma then existing as opened
and settled country and provided for by the second par-
agraph of section four of the Organic Act, had been
opened on the 22nd day of April, 1899, without the pre-
ceding provident provision of an Organic Act or of any
legislation organizing a territorial government. The act,
as it will be seen, provided that the counties and their
county seats were located "for the purpose of facilitating
the organization of a territorial government," and for
that purpose it was provided that the county seats "shall
be at the special points respectively named in the stat-
ute," and that "the county seats located by this act may
be changed in such manner as the territorial legislature
may provide." In the enactment of this legislation it was
apparently conceded by the congress that the statute of
July 30, 1886, which provided that the legislature of the
territories should not thereafter pass local or special laws
"locating or changing county seats" might be found to be
inconvenient, and not adapted to the exigency existing in
the part of Oklahoma then being provided for, since no
body of laws had theretofore been provided for the peo-
ple, and that the territorial legislature should be left free
concerning the county seats named and the provision was
then made, that "the county seats located by this act may
be changed in such manner as the territorial legislature
may provide;" that is, that with respect to the seven
counties therein provided for, they should not be hin-

dered or hampered by the Act of July 30, 1886, by which it was provided that the legislatures of the territories "shall not pass local or special laws," "locating or changing county seats," and that the territorial legislature should be left entirely free and unrestricted by the act of 1886, and should change such county seats in such manner, by either "local or special" legislation as the territorial legislature might see fit to provide. The provision thus made was a provision of enlargement, not as a substitute for, or in lieu of, or in revocation of that provision of the Organic Act which provides that the territorial legislature might legislate upon "all rightful subjects of legislation," or of the general election law for the change of county seats which was not enacted until afterward, but providing that, inasmuch as that general power was already conceded by the decisions of the courts and the legislation of congress, and inasmuch as a new condition was here presented in which congress was dividing the territory already settled into counties whose boundaries were thereafter to be ascertained. and was at the same time undertaking to say where the county seats thus established "shall be," and that inasmuch as the people and the legislature, acting in their behalf, might be hampered by so much special legislation with respect to the boundaries of the counties and the fixing of their county seats, that the territorial legislature should in that particular instance be set free from limitations provided in the statute of July 30, 1886, by which a general restriction had been imposed upon all territorial legislatures, by which they were prohibited from enacting "local or special" laws in the matter of "locating or changing county seats."

And congress, by the enactment of that provision, did not undertake to concede to the territorial legislature a power to legislate by providing a general election law providing for the removal of county seats by an election to be held by the people of the counties of Oklahoma, since that power was conceded to them by the previous decisions of the courts and by the legislation of congress. But congress did then undertake to provide, and did provide, that the territorial legislature should not in any manner be restricted by the prohibition contained in the act of July 30, 1886, against special or local legislation against changing county seats, but that, for that time and for those seven counties, "That the county seats indicated by this act may be changed in such manner as the territorial legislature may provide."

Such being the condition of the law, the territorial legislature, at its first session, enacted chapter twenty-two of the Statutes of 1890, entitled "County Seats" providing for the manner and means of "locating and relocating county seats." It provided upon what conditions the board of county commissioners "at any called or special or regular session" were authorized to call an election for the purpose of locating or changing the county seat of any county in Oklahoma. This act took effect December 25, 1890, and remained the law and, except as slightly amended by the legislative assembly at the sessin of 1893, is now the law of this Territory, and is now embodied in chapter twenty-three of the Statutes of 1893.

It is provided by section three of the Organic Act, among other things, as a part of the duties of the secretary of the territory, that:

"He shall transmit one copy of the laws and the journal of the legislative assembly within thirty days after

the end of each session thereof, to the president of the United States and to the secretary of the interior, and at the same time two copies of the laws and journals of the legislative assembly to the speaker of the house of representatives and the president of the senate, for the use of congress. * * *."

The Organic Act was passed May 2, 1890. The general election law enacted by the territorial legislature became a law on the 25th day of December, 1890, and in pursuance of the third section of the Organic Act and for the information of the president, the secretary of the interior and congress, the copies of the general election law had, undoubtedly, been transmitted to them, as provided by the Organic Act, by the secretary of the territory.

And in this condition of the law, it having been conceded by the supreme court of the United States, as has been said that such corporations as these counties are, composed of all the inhabitants of the territory included in the political organization, that the attribute of individuality is conferred on the entire mass of such residents, and may be modified or taken away at the mere will of the legislature, according to its own views of public convenience, and that they are under the entire control of the legislature from which all their powers are derived, and that it is everywhere acknowledged that the legislature possesses the power to divide the counties at their pleasure, and that political subdivisions of this kind are always subject to the general laws of the state; that the theory upon which the various governments for portions of the territory of the United States have been organized, has ever been that of leaving to the inhabitants all the powers of self government consistent with the supremacy and supervision of national authority, and, as declared

by the supreme court of Arizona, that the location of a county seat should be determined by the people of a county, their interests and convenience alone consulted, and that such laws had been too long acquiesced in by courts and the law makers to now question their validity; and in view of the legislation which congress had enacted on July 30, 1886, to check the practice in the territorial legislatures of legislating locally and specially touching the location and change of county seats, and in view, again, of its own legislation, by which it had undertaken to suspend the operation of the Act of July 30, 1886, for the benefit of the seven counties first located in Oklahoma, of which the county seats had been located, and to provide that, with respect to those counties the territorial legislature should not be hampered, but might change them in such manner as it should see fit to provide, it thereupon came on to enact further provisions for the opening of the Cherokee Outlet, and more than two years after the enactment of the general election law of Oklahoma, it provided on March 3, for opening the Cherokee Outlet, sec. 10, pp. 71 and 72, Statutes of 1893, that:

"The president of the United States is hereby authorized · * * * by proclamation to open to settlement any or all of the lands not allotted or reserved, * * * and also' subject to the provisions of the act of congress, approved May 2, 1890, (the Organic Act) entitled an act to provide a temporary government for the Territory of Oklahoma. * * * The secretary of the interior was, under the direction of the president, directed to prescribe rules and regulations, not inconsistent with this act, for the occupation and settlement of said lands, to be incorporated in the proclamation of the president, which shall be issued at least twenty days before the time fixed for the opening of said lands."

And also enacted, sec. 14, Statutes of Oklahoma, 1893, p. 73, that:

"Section 14. Before any of the aforesaid lands are open to settlement it shall be the duty of the secretary of the interior to divide the same into counties which shall contain as near as possible not less than five hundred square miles in each county. In establishing said county lines the secretary is hereby authorized to extend the lines of the counties already located so as to make the area of said counties equal, as near as may be, to the area of the counties provided for in this act: * * * Provided further, that as soon as the county lines are designated by the secretary he shall reserve not to exceed one-half section of land in each county, to be located for county seat purposes, to be entered under sections twenty-three hundred and eighty-seven and twenty-three hundred and eighty-eight of the Revised Statutes, and all reservations for county seats shall be specified in any order or proclamation which the president shall make for the opening of the lands to settlement."

Under the provisions of this act, which authorized the secretary of the interior, under the direction of the president, to prescribe rules and regulations "for the occupation and settlement" of the lands of the Cherokee Strip, the secretary reserved half sections of land "located for county seat purposes" in each of the several counties into which the Cherokee Outlet was then divided. It will be observed that when the first opening of Oklahoma occurred and the seven counties were opened and occupied for settlement, on the 22nd day of April, 1889, that congress did not provide any laws or organization for the county. It had not made any reservation of lands for county seat purposes, so that when the seven counties of which it was composed, and which were established by section four of the Organic Act, no land was reserved at

—10

all for public purposes. All of the land included in each
of said counties into which the Territory was thereby
divided had been appropriated to private use, and that
congress, when it undertook to legislate and to fix the
county seats by the act of May 2, 1890, for the land which
had then theretofore been opened and completely occu-
pied more than a year before, it said in express terms at
what point the county seat of each of the said respective
counties "shall be;" but by the proviso annexed to the
act, (section four of the Organic Act,) the people were not
only left at liberty to have a general election law, under
section six of the Organic Act, providing that "the legis-
lative power of the Territory shall extend to all rightful
subjects of legislation," as the same had been uniformly
interpreted by the courts and by the congress itself in the
act of July 30, 1886, but in order that absolute freedom
might be given upon the subject, it also made that spe-
cial provision for the particular case then in hand, by
which the general legislation and restriction of the act of
July 30, 1886, that "the legislatures of the territories    *
*    *    shall not pass local or special laws," "locating or
changing county seats." And the people and their legis-
lature were thus left wholly at liberty on the subject,
and when, afterward, the general election law, contained
in chapter thirty-three of the Statutes of 1890, was enact-
ed, which is now still in existence in chapter thirty-three
of the Statutes of 1893, providing upon what terms and
conditions and under what circumstances the people of
the respective counties of the Territory might proceed
thereunder, and more than two years thereafter congress
provided for the opening of the Cherokee Outlet, by the
act of March 3, 1893, as hereinbefore stated, it did not
fix county seats for the respective counties, nor say where

the county seats should respectively be, nor undertake to establish them at all, but, acting wholly for the benefit of the people and for their convenience alone, and in pursuance of the statute which authorized the secretary of the interior to prescribe rules and regulations, under the direction of the president, for the "occupation and settlement" of the lands of the Cherokee Outlet, the reservations authorized by the act "to be located for county seat purposes" were made. The act was one solely for the convenience and benefit of the people. It was a reservation to be accepted, if the people of the respective counties saw fit, or to be refused, if they saw fit, or to be accepted and afterwards abandoned, if they deemed it to their best interests, and acting under that legislation for the changing of the location of county seats which had been passed by the legislature of Oklahoma two years before, and of which congress had full notice, as provided under section three of the Organic Act, and according to the terms of the Organic Act itself, by section 1: "Whenever * * * the president shall make proclamation thereof, said outlet shall thereupon and without further legislation, become a part of the Territory of Oklahoma." And the Cherokee Outlet and its lands became, by such opening and by the provision herein last before recited, "a part of the Territory of Oklahoma," subject to all its laws, by the express enactment of congress, among which laws was the law for the changing of the location of county seats, contained in chapter twenty-two of the Statutes of the Territory of 1890.

It is too late now to argue that the election law enacted by the territorial legislature was not, from the time of its enactment, of valid and effective force. Ade-

quate provision was made by the Organic Act, by which congress had full information at the time of its enactment of the general county seat election law of 1890. Congress took no notice of it, did not annul or disapprove it, but permitted it to stand as proper and approved legislation, and we must, therefore, regard it as of final, effective and conclusive force.

The same proposition has been asserted by the circuit court of the United States for Oregon, in 27 Fed. Rep. p. 351, in which it is said, that:

"The fact that congress has never disallowed or disapproved the act  *  *  *  and has not legislated directly on the subject, goes far to establish its validity as not inconsistent with the Organic Act."

Upon a similar objection to a territorial statute, it was said by Chief Justice Chase in *Clinton v. Englebrecht,* 13 Wall, 434, that:

"In the first place, we observe that the law has received the implied sanction of congress. It was adopted in 1895. It has been upon the statute book for more than twelve years. It must have been transmitted to congress soon after it was enacted, for it was the duty of the secretary of the Territory to transmit to that body copies of all laws, on or before the first of the next December in each year. The simple disapproval by congress at any time would have annulled it. It is no unreasonable inference, therefore, that it was approved by that body."

The general election law for the change of the location of county seats having been fully approved December 25, 1890, and not up to this time having been revoked or disapproved by congress, and a period of nine years having elapsed, we have the express affirmation of the supreme court of the United States, by its chief justice, that "it

is no unreasonable inference, therefore, that it (this election law) was approved by that° body."

The conclusion of Chief Justice Chase that if the act passed by the legislature of the Territory, which had remained upon the statute book for a period of twelve years, without any disapproval by congress, that the reasonable inference was that it was approved by that body, is in harmony with all that has been said on the subject before, by either the supreme courts of Arizona and Montana, which we have cited, the supreme court of the United States as it has spoken in *County Commissioners of Laramie Co. v. County Commissioners of Albany Co.*, 92 U. S. 307, and in the voice of congress itself, speaking in the act of July 30, 1886, by which it expressly prohibited the territorial legislatures from enacting special and local laws for the location or change of county seats, and in which it left undisturbed the right to fix such county seats by a general act, under the authority given that the "legislative power of the Territory shall extend to all rightful subjects of legislation, not inconsistent with the constitution and laws of the United States," and with the Organic Act, by which congress undertook especially to provide that the legislature of the Territory itself should not be hampered in providing with reference to the county seats of the first seven counties, which were organized by section four of the Organic Act, but should be left free to be changed "as the territorial legislature may provide."

The position of the lower court was, that:

"When congress provided for the location of the county seat of Grant county, without giving authority to change it, the right of the legislature to authorize such change ceased. The Organic Act defining the powers of

the legislative assembly and the act of congress authorizing the location of the county seats in the Cherokee Strip, must be construed together. The later act modifies the former, and the legislature can pass no law authorizing any change in the location of such county seats until permitted to do so by congress. The act of the territorial legislature (that is, the act of December 25, 1890) under which the special election for May 16 is attempted to be held is, in my judgment, as at present advised, in conflict with the act of congress authorizing the location of the county seat of Grant county, and is, therefore, void."

We understand the proposition to be that congress, having authorized the secretary of the interior to make rules and regulations for the "settlement and occupation" of the Outlet, and such "reservations for county seats" having been made and included in the order and proclamation of the president, that this legislation by congress upon upon that subject was complete, and that it excluded and destroyed the power of the enactment upon the matter of changing county seats, made by the legislature under the authority given to it by the Organic Act, to legislate upon "all rightful subjects of legislation." We cannot agree with this contention. The effect of it, if upheld, would be to permit the provisions of the act providing for the mere "settlement and occupation" of the country and the reservations for county seat purposes," which were manifestly made in the interest of, and for the benefit of, the people and in order that they might not be excluded from having some location upon which to place the county seats and transact the public business, and to infer therefrom the complete revocation and extinction of all those powers which had been granted to all territories in the past, and which they had been conceded by the courts and congress to have; that is, of choosing

for themselves touching the change of county seats.  It would result in a repeal of statutes by inference, and against the right of the people to vote upon this most important subject.  If it had been the intention of congress to repeal the enactment of former years, and to revoke the legislation of the Territory of 1890, the general election law for removal of county seats, it could readily have done so in explicit terms and by express statutory revocation, and it would undoubtedly have done so.  And this is the reasonable inference, rather than  that  inference which would deprive the people of the right to vote upon a subject which concerns the people of the counties so much and the congress of the United States and the rest of the country not at all.

The reasonable view to take of this provision is that congress meant to give, by the proviso authorizing the territorial legislature to relocate the county seats of the first seven counties of Oklahoma, a special authority to the legislature to act by local or special legislation in the premises, and that when it provided for the reservations of half sections of land in each of the counties to be located in the Cherokee Strip, that it was a special provision for that occasion only, and in order that the people might not be without a reservation or portion of the public land upon which the public business might be transacted and that it was not intended as a restriction of the general powers of the legislature to legislate "upon all rightful subjects of legislation," and of the general power thereunder, uniformly conceded by the courts and by the later legislation of congress itself, in the act of July 30, 1886, to enact a general election law providing for the removal of county seats.  It will not do to undertake to upset the long settled policy of the government of the

United States in providing for the government of its territories, settled in the terms which we have herein repeatedly specified for a period of more than sixty years, by which the people in all counties of all the territories have been permitted to choose for themselves or by the local and special legislation of other various territories up to July 30, 1886, concerning the removal of other county seats, and now to infer that congress meant to repeal th's whole policy, persisted in for so many years and legislated into the Organic Acts of so many territories, simply because the secretary of the interior and the president were authorized to open the Cherokee Outlet for "occupation and settlement" and "reserve" half sections of land therefor. It has been repeatedly held that when congress confers authority upon the legislative assembly of a territory, and in pursuance of this power, laws are enacted for the government of the people thereof, such enactment must be respected and upheld, unless clearly in conflict with some higher law. (*Innis v. Bolton*, 17 Pac. 264.)

And that:

"Such acts are not to be set aside or treated as invalid, because upon a careful consideration of their character, doubts may arise as to the competency of the legislature to pass them." (*Maynard v. Hill*, 125 U. S. 204.)

And that:

"The theory upon which the various governments for portions of the territory of the United States have been organized has ever been that of leaving to the inhabitants all the powers of self government consistent with the supremacy and supervision of national authority." (*Clinton v. Englebrecht*, 13 Wall. 434.)

And it was said by the supreme court of Massachusetts, by the greatest of its chief justices, Shaw, then presiding, that the uniform rule, well established, was "nev-

er to declare a statute void, unless the nullity and invalidity of the act are placed in their judgment beyond reasonable doubt." (*Wellington Case*, 16 Pick. 95.) A rule which was adopted by the supreme court of the United States in *Ogden v. Saunders*.

And that:

"If I could rest my opinion in favor of the constitutionality of the law on which the question arises on no other ground than this doubt, so felt and acknowledged, that alone, would, in my estimation, be a satisfactory vindication of it. It is but a decent respect due to the wisdom, the integrity and the patriotism of the legislative body by which any law is passed, to presume in favor of its validity until its violation of the law is presumed beyond all reasonable doubt." (*Ogden v. Saunders*, 12 Wheat, 213.)

And our experience with the rule in criminal proceedings will adequately inform us touching the force and weight of reasoning which must produce a conclusion "beyond a reasonable doubt." And that is the rule we must follow if we now undertake to set aside the acts of our territorial legislature in authorizing, as it did, the act for the change of county seats.

A question somewhat analogous has arisen in the bigamy cases in Idaho. Congress provided by the act of March 22, 1882, with respect to all the territories, sec. 38:

"That no polygamist, bigamist, or person cohabiting with more than one woman, and no woman cohabiting with any of the persons described as aforesaid in this section, in any territory or other place over which the United States have exclusive jurisdiction, shall be entitled to vote at any election held in any such territory or other place, or be eligible for election or appointment to or be entitled to hold any office or place of public trust, honor,

or emolument in, under, or for any such territory or place, or under the United States."

Thereafter, the territorial legislature of Idaho, in 1885, undertook to, and did, enact what was known as the "Test Oath Statute" requiring a person offering his vote at an election, if required, to swear:

"That you are not a member of any order, organization or association which teaches, advises, counsels or encourages its members, devotees, or any other persons to commit the crime of bigamy or polygamy or plural or celestial marriage as a doctrinal rite of such organization; that you do not, either publicly or privately, or in any manner whatever, teach, advise, counsel or encourage any person to commit the crime of bigamy or polygamy or any other crime defined by law either as a religious duty or otherwise; that you regard the constitution of the United States, and the laws thereof, and of this territory, as interpreted by the courts, as the supreme law of the land, the teachings of any order, organization or association to the contrary notwithstanding * * * so help you God."

The validity of the territorial statute was contested in the case, and it having been argued that, inasmuch as congress had by the act of March 22, 1882, legislated upon the subject, it had exhausted the subject, and that the territorial legislature had no further power to act in the matter, inasmuch as the territorial statutes treating of the same matter conflicted with the congressional enactment.

The supreme court of the territory, in *Innis v. Bolton*, 17 Pac. 264, said, that:

"Counsel contends that by this act congress undertook to legislate upon the whole subject of disfranchisements growing out of polygamy, bigamy, and unlawful cohabitation, and therefore by implication withdrew or revoked the former grant of legislative power to the territories. We are unable to find anything in the act itself to warrant

this conclusion. The act creates additional disqualifica-
tions, and it is to that extent, we think, to be regarded
as an amendment to the organic law. Repeal by implica-
tion is not favored, and we cannot believe it was the inten-
tion of congress to take away the power over this subject
delegated by sec. 1600 of the Revised Statutes, but think
the intention was only to engraft or place another limita-
tion upon that power. This view seems more in conso-
nance with the policy heretofore pursued by the general
government towards the territories. It is true that the
congress has the paramount right, and may directly legis-
late for the government of any territory, and may di-
rectly repeal or abrogate any act of the territorial legis-
lature. But it is also true that when congress confers
power upon the legislative assembly of a territory, and
in pursuance of this power, laws are enacted for the gov-
ernment of the people thereof, such enactments must be
respected and upheld, unless clearly in conflict with some
higher law.

"The act of March 22, 1882, disfranchises bigamists,
polygamists, and those who are guilty of unlawful cohab-
itation, and disqualifies them from holding office. Section
2 of our statute contains substantially the same provi-
sion, as to this class of persons, and then further disquali-
fies all who counsel, advise, aid and abet in the commis-
sion of these offences. Section 16 of the statute (herein-
before quoted) establishes the mode by which the dis-
qualifications fixed by the former section and by the act
of congress may be ascertained and determined. We see
no reason why the legislature, under the delegation of
power, could not do this, and therefore conclude the pow-
er was concurrent, and, so far as this question is con-
cerned, that these acts may stand together."

The same question again arose in *Wooley v. Watkins,*
22 Pac. 102. The court there said, that:

"This theory of interpretation is in effect, that con-
gress, by the act referred to, repealed those provisions of
the Organic Act above recited, which confer power upon

the territorial legislature to prescribe the qualifications and disabilities of voters of the Territory. This view may commend itself for ingenuity, but cannot be regarded as sound. It is not a correct construction of the statutes referred to. If congress intended that act to have any such effect, it would have so declared by express terms, and would not have left its intention to inference. Repeal by inference or implication is not favored in the law. It is held to occur only where different statutes cover the same ground, and there is a clear and irreconcilable conflict between the earlier and the later. (*Board v. Coal Co.*, 93 U. S. 137; *Chew Heong v. United States*, 112 U. S. 536, 5 Sup. Ct. Rep. 255.) A careful reading and comparison of the provisions of the act of congress of March 22, 1882, and those of the act of the territorial assembly of February 3, 1885, which bear upon this subject, fail to develop such a clear and irreconcilable conflict between them as bring them within the rule above stated; but, on the contrary, plainly shows that the power conferred by congress upon the territorial assembly to prescribe the qualifications and disabilities of voters in the territory is not absolute and exclusive of the power of congress to legislate upon the same subject, but is concurrent, and must be exercised subject to the constitutional limitations and restrictions imposed by congress in the Organic Act."

Further discussing the question of the limitations of the Organic Act upon the question of suffrage, that court says:

"An act of congress is not an act of a territorial legislature, and *vice versa.* Each may act upon the same subject, from its own standpoint, and the acts of each may be valid. In such case their powers are clearly concurrent. But in the act of 1882 the act of congress does not cover, nor profess to cover, the same ground as the act of the territory. It does not deal with memberships in any organization as a qualification to vote. The one subject is not even germane to the other; or, if it has a remote re-

lation, as is contended, congress did not choose to enter on the ground covered by the territorial legislature. The counsel cites, in addition to the Edmunds Act, *Houston v. Moore*, 5 Wheat. 22-24; *Prigg v. Com.*, 16 Pet. 618; *Passenger Cases*, 7 How. 400, and elementary authorities. All the cases cited involve the relation between the several state governments and the United States. In them it is a question of which sovereignty has the power to dispute. Congress exercises power delegated by the states. If the former have those powers, the latter, except in exceptional cases, does not possess them. No such relations of antagonism exist between congress and territories. The will of congress and that of territorial legislatures are not two distinct wills, within the holding of some of those cases, but are for certain purposes (of which the act in question is one) one and the same will. While in their operation they are distinct, there is the relation of superior and inferior in all territorial affairs; and the superior may prohibit or nullify the acts of the inferior. Until it does so, the acts of the inferior are as valid, within its province as the acts of the superior. If it were true (although it is not true), that sec. 8 of the Edmunds Act covered the whole ground of sec. 501, and that each was intended as a punishment for the same offence, under the authority cited by the appellant, (*Houston v. Moore*, 5 Wheat. 23) it would seem that the combined acts would be only concurrent, and that both would be valid. See, also, *Innis v. Bolton*, 17 Pac. Rep. 264. But it is not necessary to go to the extent indicated in that case, as the two acts do not cover the same ground. After a careful consideration of this case, we do not find the act of the territorial legislature in conflict with any provisions of the federal constitution, or with any act of congress. The ruling and the judgment of the court below must be affirmed."

The same principle of construction was under discussion in the Territory of Montana, in the case of *Sperling v. Calfee*, 19 Pac. 207. It was there said, that:

"Counsel for appellants contend in their brief and in their argument that this judgment is void upon its face, having been entered by the clerk upon default in vacation; that he thereby performed a judicial act, which, under the Organic Act, he could not do. The Organic Act names the courts of the territory, and, to a limited extent, defines their jurisdiction; but the rules of procedure in the courts thus established are left nearly or entirely to the different territorial legislatures.  *  *  * Of course, in case of any difficulties arising out of this state of things, congress has it in its power at any time to establish such regulations, on this as well as on any other subject of legislation as it shall deem expedient and proper. The fact that congress has never disallowed or disapproved the act conferring this power on the clerks of the courts, and has not legislated directly on the subject, goes far to establish its validity as not inconsistent with the Organic Act. The statute under consideration was adopted from the code of California, and the courts of that state have held, as far as we have discovered, that the power conferred by it on clerks of courts was ministerial and not judicial."

The subject was discussed in *Davis v. Beason*, 133 U. S. 333, Mr. Justice Field writing the opinion, in which it was said:

"These limitations are the only ones placed upon the authority of territorial legislatures against granting the right of suffrage or of holding office. They have power, therefore, to prescribe any reasonable qualifications of voters and for holding office not inconsistent with the above limitations. In our judgment, sec. 501 of the Revised Statutes of Idaho Territory, which provides that 'no person under guardianship, *non compos mentis* or insane, nor any person convicted of treason, felony or bribery in this territory, or any other state or territory in the Union, unless restored to civil rights; or any person who is a bigamist or polygamist, or who teaches, advises,

counsels or encourages any person or persons to become a bigamist or polygamist, or to commit any other crime defined by law, or to enter into what is known as plural or celestial marriages, or who is a member of any order, organization or association or otherwise, is permitted to vote at any election, or to hold any position or office of honor or trust, or profit within this territory is not open to any constitutional or legal objection. With the exception of persons under guardianship or of unsound mind, it simply excludes from the privilege of voting, or of holding any office of honor, trust or profit, those who have been convicted of certain offenses, and those who advocate a practical resistance to the laws of the Territory, and justify and approve the commission of crimes forbidden by it. The second subdivision of sec. 504, of the Revised Statutes of Idaho, requiring every person desiring to have his name registered as a voter to take an oath that he does not belong to an order that advises a disregard of the criminal law of the Territory, is not open to any valid legal objection to which our attention has been called.

"The position that congress has by its statute covered the whole subject of punitive legislation against bigamy and polygamy, leaving nothing for territorial action on the subject, does not impress us as entitled to much weight. The statute of congress of March 22, 1882, amending a previous section of the revised statutes in reference to bigamy, declares that no polygamist, bigamist, or any person cohabiting with more than one woman, and no woman cohabiting with any of the persons described as aforesaid in this section, in any territory or other place over which the United States have exclusive jurisdiction, shall be entitled to vote at any election held in any such territory or other place, or be eligible for election or appointment to or be entitled to hold any office or place of public trust, honor or emolument in, under, or for any such territory or place, or under the United States. (22 Stat. 31, ch. 47, sec. 8.)

"This is a general law applicable to all territories and other places under the exclusive jurisdiction of the United States. It does not purport to restrict the legislation of the territories over kindred offenses, or over the means for their ascertainment and prevention. The case in which the legislation of congress will supersede the legislation of a state or territory, without specific provision to that effect, are those in which the same matter is the subject of legislation by both. There the action of congress may well be considered as covering the entire ground. But here there is nothing of this kind. The act of congress does not touch upon teaching, advising and counseling the practice of bigamy and polygamy, that is, upon aiding and abetting in the commission of those crimes, nor upon the mode adopted by means of the oath required for registration, to prevent persons from being enabled by their votes to defeat the criminal laws of the country."

It was said by Chief Justice Marshall, in *Fletcher v. Peck*, 6 Cranch. 87, that:

"The question whether a law be void for its repugnancy to the constitution is at all times a question of much delicacy, which ought seldom, if ever, be decided in the affirmative in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and law should be such that the judge feels a clear and strong conviction of their incompatibility with each other."

Since, therefore, it has been abundantly settled that repeal by implication will not be favored, and since it is true that when congress confers the power upon the legislative ass . ubly of a. territory and in pursuance of this

power, laws are enacted for the government of the people thereof, such enactment must be respected and upheld, unless clearly in conflict with some higher law, and there is some clear and irreconcilable conflict between the statutes, and unless the statute which is relied upon to found the inference or revocation be clear and full and unmistakable, and it has been the purpose of congress manifestly to prohibit and nullify the acts of the territorial legislature, the act of the legislature will stand, and an attempt at repeal by inference of the territorial act will be disapproved.

And the fact that congress has never disallowed or disapproved the act conferring this power on the clerks of courts, and has not legislated directly on the subject, and that a decent respect due to the wisdom, the integrity and the patriotism of the legislative body by which the law has been passed to presume in favor of its validity until its violation of the law of congress is seen to be beyond all reasonable doubt, we cannot agree with this inference.

But the citation of these authorities may, indeed, not be deemed necessary in view of the legislation of congress itself, since, in the act of July 30, 1886, in the provision to prohibit the passage of "local or special laws" in the territories, the prohibition upon this subject was against "locating or changing county seats," congress itself in the enactment recognized the difference between the original location of a county seat, and the changing of it afterwards, and deemed it necessary in the attempt to forbid such legislation, to prohibit, not only legislation with reference to the "location" of county seats, but also, in specific terms and other language, forbade "special and

local" legislation by the territorial legislatures, which should undertake to "change" them. And it may, therefore, be conclusively held that, since the authority of the secretary of the interior, which was exercised by him in opening the Cherokee Outlet, was merely to reserve three hundred and twenty acres for county seat purposes, and that congress did not even provide that the county seats should be upon these reservations, as it had provided in the Organic Act that the respective county seats of the seven counties therein provided for "shall be" at the respective county seats therein named, and that the act providing for the opening of the Cherokee Outlet, to-wit. the act of March, 1893, following the spirit and terms of its own legislation, treated only of a provision of a half section of land to be made for the benefit of the people themselves, and "reserved" such half section therefor, and left the whole topic of "changing county seats" unmentioned, untreated of and not legislated for, except by the act of July 30, 1886, by which "special and local" legislation on the subject of "change" of county seats was prohibited to the territorial legislatures.

It has been said that: "This is an *ex parte* hearing, without notice, and the writ should not issue unless the right is clear and unquestioned," and that "the supreme court of Kansas in the case of *Conley v. Fleming et al.*, 14 Kans. 381, said 'in the selection of a county seat the electors are not limited to existing cities and counties, but may choose a site for a new town, and locate the county seat thereon.' "

The citation of authority is inapplicable. The statute which the supreme court of Kansas interpreted and applied in *Conley v. Fleming*, sec. 2, entitled, "An Act Con-

cerning the Location of County Seats," which "took effect
March 3, 1868," and which is sec. 1708 of the Complied
Laws of Kansas, 1885, provides:

"That when the county seat of any county has been
located by a vote of the electors of the county, the place
to which it is proposed to remove the county seat shall be
designated, in the petition, and the balloting at the elec-
tion shall be for or against the removal of the county seat
to the place so designated and no election for the reloca-
tion of any such county seat shall be ordered or had with-
in five.years from the last preceding election, touching the
location or relocation of any such county seat."

Upon this statute the supreme court of Kansas, in
*Conley v. Fleming*, 14 Kans. 296, by Judge Brewer, said
that:

"The two remaining allegations of the petition may
be considered together. The place declared the newly-
chosen county seat is thus described in the proclamation
of the result: 'Farmer City, situated as follows: 40 acres
in S. E. ¼ of N. W. ¼ of sec. 14; 30 acres off the S. W. ¼
of the N. E. ¼ of sec.14,—all in town 21 of range 23, in
Linn county, Kansas.' Now, it is alleged that at the time
of said election there was no such place as 'Farmer City,'
and no city, town or village anywhere within the limits of
said 'section 14;' and that at the first election some of
the ballots counted as for this place contained the very
words of the description in the proclamation, while oth-
ers added on the word 'and' between the words 'sec. 14'
and '30 acres'; and that, classing these ballots as for sep-
arate places, neither of them stood first or second in the
list of candidates. On the other hand, it is alleged that
prior to the first election the place designated and known
as 'Farmer City' was selected upon actual view, and
placed in nomination as one of the places to be voted for,
by a convention of five delegates from each of the six
townships, and that such selection was witnessed by two

hundred or more persons from different parts of the
county; and that the place so selected and named 'Farmer
City' became and was quite notorious, and at each of said
elections was generally known and understood by the
legal electors voting at said election. There seems to
have been no dispute as to the facts thus alleged on the
respective sides. If the majority of the electors of a
county are unwilling to select any of the existing towns
for the county seat, but prefer to choose a new place, and
start a new town therefor, we know of nothing to prevent
them from so doing. Each elector is to give 'the name
of the place' for which he votes. This 'place' may be
an incorporated city, a village, or an unoccupied quarter
section; and if a majority choose a tract of unimproved
prairie, the courts have no power to interfere and set aside
their selection. The wisdom of such a choice may be ques-
tioned, but the power to make it is beyond dispute. Again,
if a given tract of land is known by a specific name, the
use of that name is a sufficient description. If a certain
definite seventy acre tract was generally known as and by
the name of 'Farmer City,' the use of that term in a ballot
was a sufficient description, and the ballot was not viti-
ated by a mere imperfection in a further description
therein of the land."

It has been argued in this case, that:

"There may be some question as to whether a board
of election commissioners are authorized to act in an elec-
tion of this kind, but in any event, if acting, they cannot
disregard any place petitioned for by the required num-
ber of electors. Their acts in this particular are not
*quasi* judicial, nor are they required to exercise discretion
The act of placing the names on the ballot is ministerial.
Of course, if a controversy should arise as to right of con-
testing candidates for the same place, no court would at-
tempt to control the decision of the election commission-
ers as to which was the rightful claimant. Their decision
in such matters is conclusive."

But the reasoning of Judge Brewer does not fit the statute of Oklahoma which we must interpret and apply in this case. The statute which we must apply, sec. 1822, of an act providing for the manner and means of locating and relocating county seats, p. 417 Statutes of 1893, reads as follows:

"Sec. 1822. At the election there shall be written or printed on the ballots to be voted in that county, the words 'For county seat,' naming the town desired to be voted, as the voter may wish to vote, and if a majority of the votes cast at the first election be for any one point named, then that shall be the county seat of that county, and within ninety days after the day of election, the offices, furniture, books and records of the county shall be removed to the point so chosen, and the county seat there established. If, however, at such election no one town in the county receive a majority of all the votes cast the county commissioners shall, when the election returns are canvassed, be bound to call another election within the county, to determine the location of the county seat at such election and shall at such election give notice for twenty days before the time of voting, as before provided, and shall state the names of the two towns receiving the greatest number of votes at the last election, and at such second election the voters shall cast their ballot for one or the other of the two towns so named, and the town receiving the highest number of votes at the second election shall be the point chosen as the county seat, and the county seat shall be there established within ninety days after the vote is canvassed."

The statute of Kansas referred to simply directed, that: "the balloting at the election shall be for or against a removal of the county seats to the place so designated." And it was incumbent upon the supreme court of Kansas to enforce the writ of *mandamus* while the board of county commissioners, who were the defendants,

were acting in a ministerial capacity only, since the elec-
tor was, under the Kansas statute. only required to give
the name of the "place" for which he voted, and it was
property said in the opinion of Judge Brewer, that:

"This 'place' may be an incorporated city, a village,
or an unoccupied quarter section; and if a majority
choose a tract of unimproved prairie, the courts have no
power to interfere and set aside their selection. The wis-
oom of such a choice may be questioned, but the power to
make it is beyond dispute."

It is plain that upon the facts of the Kansas case, the
application for the writ of *mandamus* was sustained solely
upon the ground that the legislative enactment required
upon the ballot, not the name of a town, but of a "place,"
while the Statute of Oklahoma provides that, in the elec-
tion for the removal of a county seat in Oklahoma, the
ballots shall contain the words, " 'for county seat,' nam-
ing the town desired to be voted for." And again, "If,
however, at such election no one town in the county re-
ceive a majority of all the votes," a provision is made for
a re-election, and the notice thereof "shall state the names
of the two towns receiving the greatest number of votes
at the last election, and at such second election the vot-
ers shall cast their ballots for one or the other of the
two towns named, and the town receiving the highest
number of votes at the second election shall be the point
chosen as the county seat."

If the supreme court of Kansas had had this statute
to pass upon, it may well be presumed that they would
have put into practical application and force the observa-
tion made in the case of *Conley v. Fleming*, in referring
to the provision that the county seat might be removed to
a "place" other than an incorporated city or village, when

it said "the wisdom of such a choice may be questioned, but the power to make it is beyond dispute." To be sure, it is beyond dispute under the Kansas statute, neither is it open to dispute under the Oklahoma statute, since the statute explicitly provides that a "town" shall be named upon the ballot and that upon a second election the voting shall be confined to the "two towns" receiving the greatest number of votes, and that of those "two towns" so named, the town receiving the highest number of votes shall be the point chosen as the county seat.

The case was heard upon the petition and the facts recited therein, *ex parte* and without notice. It does not pretend to state that any town was voted for. The application was "to compel the board of election commissioners to place the name of 'Centerville' on the official ballot," and that a petition was filed, signed by a number of resident and legal voters of the county naming the "N. W. ¼, sec. 30," etc., naming such "location" Centerville as one of the places to be voted for. It is no where said or pretended in the application that Centerville was anything more than a "location" or a "place" designated as the N. W. ¼ of sec. 30, etc., in Grant county. The application was not adequate, under our statute, which requires that none but "towns" shall be voted for as county seats at the election to be held under the statute in question.